(No. 91232
(No. 91239

ROBERT SNELSON, Appellee and Cross-Appellant, v. DONALD KAMM, M.D., *et al.* (Donald Kamm, M.D., Appellant and Cross-Appellee).

*Opinion filed March 20, 2003.*

4

8

RARICK, J., took no part.

Michael J. Kehart and Albert G. Webber, of Kehart,

Shafter, Webber, Campbell & Robinson, of Decatur, for appellant.

Patrick S. O'Shaughnessy and Christopher R. Doscotch, of The Janssen Law Center, of Peoria, for appellee.

Patrick S. O'Shaughnessy and Christopher R. Doscotch, of The Janssen Law Center, of Peoria, for appellant.

Michael J. Kehart, of Kehart, Shafter, Webber, Campbell & Robinson, of Decatur, for appellee Donald Kamm.

Richard J. Wilderson and April G. Troemper, of Graham & Graham, Ltd., of Springfield, and Hugh C. Griffin and Stevie A. Starnes, of Lord, Bissell & Brook, of Chicago, for appellee St. Mary's Hospital of Decatur.

JUSTICE THOMAS delivered the opinion of the court:

Plaintiff, Robert Snelson, brought a negligence action against defendants, Donald Kamm, M.D. (Kamm), and St. Mary's Hospital of Decatur (St. Mary's). Following a jury trial in the circuit court of Macon County, a verdict was returned in favor of Snelson and against Kamm and St. Mary's in the amount of $7 million. After a hearing on defendants' posttrial motions, the trial court granted St. Mary's a judgment notwithstanding the verdict (judgment *n.o.v.*) on the issue of proximate cause and granted Kamm a new trial on the issue of damages, setting aside the $7 million award. The appellate court consolidated

the separate appeals by Snelson and Kamm, and affirmed the orders of the trial court. 319 Ill. App. 3d 116. We allowed Snelson's and Kamm's petitions for leave to appeal (177 Ill. 2d R. 315) and also consolidated the appeals.

Before this court, Snelson contends that the trial court erred by: (1) granting Kamm a new trial on the issue of damages; and (2) granting St. Mary's motion for judgment *n.o.v.* Kamm challenges certain of the trial court's rulings and the jury's verdict. Specifically, Kamm claims: (1) he was improperly prevented from examining Snelson's medical expert as to bias; (2) the testimony of Snelson's medical expert should not have been admitted, because it lacked foundation; (3) the jury was improperly instructed; (4) certain medical bills of Snelson's were improperly admitted into evidence; (5) the verdict was tainted by extraneous information; (6) the verdict was against the manifest weight of the evidence; and (7) the verdict is excessive.

## BACKGROUND

At the June 1999 jury trial, the following evidence was adduced. In March 1994, Snelson was 58 years old and employed as a clerk by the Illinois Central Gulf Railroad. Snelson was referred to Kamm, a general surgeon, who suggested that Snelson undergo a radiological procedure known as an aortogram or arteriogram, to determine the location of arterial blockages in his legs caused by arteriosclerosis, commonly referred to as hardening of the arteries. Dr. Carlos Capati, a radiologist practicing at St. Mary's, testified that, on March 2, 1999, while attempting to perform a translumbar aortogram on Snelson, he experienced difficulty navigating the guide wire into the thoracic aorta. It appeared that the guide wire instead entered the superior mesenteric artery, which supplies blood to the intestine. Capati withdrew the translumbar needle and the guide wire and attempted to reinsert the guide wire into the aorta. During the

second attempt, however, Snelson's blood pressure dropped, he complained of abdominal and back pain and expressed an urge to have a bowel movement. A portable commode was brought in and Capati examined Snelson's stool, but did not notice any discoloration. At that point, Capati terminated the procedure and informed Kamm that he had been unable to complete the test and that Snelson was complaining of back and abdominal pain.

Snelson's son, James Snelson, testified that following the unsuccessful aortogram, he saw his father being brought back to his room on a stretcher, "screaming and yelling." Once in his bed, Snelson began complaining of "a lot of pain in his stomach." He was lying on his side "in a fetal position" with his eyes closed and was sweating profusely. Snelson also complained of pressure in his stomach and the need to use the bathroom. James stated that he went to the nurses' station and told them that his father needed a catheter and one was provided at about 3 or 3:30 p.m. James testified that he left St. Mary's late that afternoon to care for his mother and, prior to his departure, did not see Kamm visit his father. James stated that he spoke to his father by telephone that evening at approximately 8 p.m., and that his father still complained of pain and was not making sense.

The nurses on staff at St. Mary's on March 2 and 3, 1994, recorded notes on Snelson's condition, but none who testified at trial had any independent recollection of the events. The nurses' notes indicate that, following the unsuccessful aortogram, Snelson was returned to his room at 12:40 p.m. He was complaining of pain in his abdomen and cramping and requested a bedside commode. A 12:44 p.m. shift assessment showed that Snelson was alert and complaining of pain. According to the nurses' notes, the pain rated "7" on a scale of 1 to 10. At 12:45 p.m., Snelson had a large bowel movement and continued to complain of severe pain across the middle of

his abdomen radiating into his back. At this point, the nurses notified Kamm of Snelson's complaints of abdominal pain. In response, Kamm ordered by phone that Snelson receive blood tests and pain medication, 50 milligrams Demerol by muscular injection, every three hours as needed. Kamm also ordered that Snelson's vital signs be taken every 15 minutes for two hours and then hourly thereafter.

Snelson's vital signs were then checked every 15 minutes from 12:45 p.m. to 2:30 p.m. During this period, plaintiff's temperature stayed below normal, his respirations were normal and remained constant. His pulse rose during the first hour and then fell back to normal the second hour, while his blood pressure dropped and rose throughout the period.

The nurses charted in their flow sheet that a catheter was inserted to empty Snelson's bladder around 3 p.m. A second shift assessment at 3:35 p.m. showed Snelson's bowel sounds were normal, but he continued to complain of abdominal pain. At 4 p.m., Snelson had a bowel movement with blood-tinged mucous. The nurses immediately paged Dr. Kamm, and were advised that he was in surgery at another hospital. Kamm called back at 4:30 p.m. and was advised by a nurse of the bloody bowel movement. Kamm testified that he spoke with the nurse about Snelson's condition at 4:30 p.m., and concluded that the bloody stool was due to a mild hemorrhoid or fissure. Kamm told the nurse he would quickly conclude his duties at the other hospital and would proceed directly to St. Mary's.

At 6 p.m., Kamm arrived at St. Mary's and examined Snelson for 15 or 20 minutes. At this time, Kamm had access to the nurses' notes, shift assessments, flow sheets and vital sign records which had recorded Snelson's condition. Kamm noted that Snelson's vital signs were stable, but he had passed several small blood-tinged

stools and was complaining of abdominal pain and difficulty urinating. Kamm found that Snelson's lower abdomen was tender and distended, with diminished bowel sounds. Kamm's notes further state the following: "Concerned about mesenteric insufficiency or thromboembolus with ischemia. Will watch closely." Kamm testified that he was not making a diagnosis of mesenteric ischemia, or deficiency of blood circulation to the intestinal system, but rather was "entertaining [it] as a one of the rare possibilities" of arteriographic puncture complications. Rather, at the time, Kamm thought that the most likely cause of Snelson's pain was bleeding into his retroperitoneal area from the puncture sites.

Because Kamm believed that the fullness and tenderness in Snelson's lower abdomen was consistent with a distended bladder, he ordered a catheter inserted. Kamm noted that the catheter caused considerable relief in Snelson's discomfort at that point. Kamm believed that the catheter inserted after his 6 p.m. examination was the first time a catheter had been used on Snelson. However, the nurses' flow sheet, which Kamm had available to him at the 6 p.m. examination, indicated that a catheter had been inserted at 3 p.m. Kamm acknowledged that a catheter could have been ordered before he arrived as part of a postoperative order. At any rate, it was undisputed that the catheter brought pressure relief and lessened Snelson's discomfort.

Kamm further testified that, based on his 6 p.m. assessment, he believed Snelson's condition had stabilized, and that it was therefore safe to increase his pain medication from 50 milligrams to 100 milligrams of Demerol every four hours as needed. He further ordered that Snelson have no food or liquids by mouth, that the nurses check his vital signs every four hours, and that some laboratory work be completed for the next morning. Kamm then left St. Mary's for the evening.

After Kamm's examination, the nurses observed Snelson at least every hour. A nurse's notation for that evening indicates that Snelson had a normal bowel movement and received Demerol at 7 p.m. It was also noted that Snelson slept most of the evening. He was awake at 10 p.m., but was back asleep at 11 p.m. No documentation exists showing that Snelson's vital signs were taken at 10 p.m.

Kamm conferred with the nurses before he went to bed around 10 p.m. and was advised that Snelson was stable and that they had nothing new to report. At midnight, Snelson's vital signs were taken. The section in the shift assessment to indicate level of pain was not marked at that time. St. Mary's nurse Belinda Durbin testified that at 12:45 a.m. on March 3, she administered 100 milligrams of Demerol to Snelson because he was having some pain. She further noted, however, that if he had been experiencing severe pain she would have made a notation of that fact in the records. At 4 a.m., Snelson's vital signs were taken again.

Kamm returned to the hospital on March 3, 1994, and examined Snelson between 6 and 6:30 a.m. It appeared to Kamm that Snelson had not improved over the prior 18 hours, and he had an abnormally high white blood cell count. Over the next four hours, a computerized tomography (CT) scan and abdominal X rays were taken, which showed definite abnormalities, including the presence of air in Snelson's small intestine. Capati, who interpreted the CT scan and X rays, testified that the results were consistent with "small and large bowel infarction," which meant that parts of Snelson's small and large bowel loops were gangrenous or dead. Capati further testified that the most likely cause of that condition was "acute embolism and thrombosis involving the superior mesenteric artery," meaning that a plaque or clot moving within the blood vessel, or a preexisting

plaque or clot, had blocked the superior mesenteric artery. Capati opined that the unsuccessful translumbar aortogram caused the death of portions of Snelson's intestine.

Kamm performed emergency exploratory surgery on Snelson later that morning and found that almost all of his small intestine and half of his large intestine were dead due to lack of blood circulation to the area. It was therefore necessary to remove approximately 95% of Snelson's small intestine and the right half of his large intestine. Snelson was discharged from St. Mary's on March 21, 1994.

With regard to this cause of action, Kamm testified that the nurses had adequately observed Snelson and reported to him everything that he needed to know about Snelson's condition following the unsuccessful aortogram. He further stated that, if he had wanted to perform surgery sooner, he would have; however, he did not think it was indicated. On cross-examination, Kamm admitted that, as with any disease, there are signs and symptoms, and that 80% of patients with mesenteric insufficiency will exhibit abdominal pain often described as out of proportion to the physical findings. He further agreed that blood in the stool can be considered a sign of mesenteric ischemia and that occult blood, not detectible by mere sight, could be found in 75% of such cases.

Dr. James Sarnelle, Snelson's medical expert, testified that he is a general and vascular surgeon familiar with intestinal surgery and the translumbar arteriogram procedure, including its risks and complications. Sarnelle opined that, during Snelson's unsuccessful arteriogram, the guide wire had injured the lining of the superior mesenteric artery, which caused a blood clot to form and, "[o]ver time," led to the death of the intestines from a loss of circulation. Sarnelle testified that he was familiar with the national standard of care for a reasonably well-

qualified general surgeon as it related to a patient in Snelson's condition on March 2, 1994, and opined that Kamm's treatment of Snelson following the unsuccessful arteriogram breached the standard of care because Kamm "did not take any action which was necessary to save [Snelson's] small bowel." Sarnelle reasoned: "[Snelson] has all the signs of mesenteric ischemia. In fact, [Kamm] even mentions it in his note at 6 o'clock that he is concerned about ischemia or thrombosis and yet he does nothing, just says will watch closely." According to Sarnelle, Kamm should not have been watching Snelson closely but instead should have immediately performed surgery to restore circulation, which would have saved a large portion of Snelson's intestine.

According to Sarnelle, the following signs and symptoms should have alerted Kamm to the mesenteric ischemia: (1) Capati's indication that during the unsuccessful arteriogram the guide line went into the superior mesenteric artery; (2) Snelson's drop in blood pressure and abdominal pain during the procedure; (3) Snelson's need to have an immediate bowel movement during the procedure; (4) the bloody bowel movements following the procedure; (5) abdominal pain that was severe enough for Kamm to increase the Demerol; and (6) the distention and tenderness of Snelson's lower abdomen during Kamm's 6 p.m. examination.

Sarnelle further opined that "a window of opportunity" existed to prevent the permanent loss of Snelson's intestine. At 6 p.m., Snelson was stable enough to have surgery, and Sarnelle testified that, if revascularization surgery had been performed in a timely fashion on March 2, a large portion of Snelson's intestine could have been salvaged and he would not now be dependent on intravenous supplemental nutrition. Sarnelle testified that the latest point in time that Snelson's intestines could have been saved was midnight on March 2, and

"after that it was too late." Sarnelle explained that, while the length of time that intestines will remain viable once blood supply is lost is variable from patient to patient and cannot be determined with 100% certainty, based on the clinical data contained in Snelson's medical records, the latest time his intestine could have been saved was around midnight.

Sarnelle acknowledged that, generally, acute mesenteric ischemia is very difficult to diagnose because the typical patient has an onset of abdominal pain with no clear history of causation. Additionally, the typical patient is elderly and has trouble communicating. However, Sarnelle testified that Snelson's case was different because, unlike the typical patient who is admitted to the hospital several hours after the onset of pain: (1) Snelson was in the hospital at the time the ischemia began; (2) the problems that developed during the unsuccessful arteriogram involved the superior mesenteric artery; and (3) Snelson developed signs and symptoms quickly and did not just arrive at the hospital with "some obscure things going on."

Sarnelle opined that Kamm breached the appropriate standard of care by ordering pain medication for Snelson. In that regard, Sarnelle stated the following:

"[Y]ou should not be giving a patient pain medicine if you do not know what is going on. The problem with the pain medicine is that you mask the findings, the person may have a lot of problems going on in their abdomen, especially mesenteric ischemia you may give pain medicine and they could feel somewhat better, and you don't know whether they are really getting better or I am just thinking they are feeling better yet a catastrophe is brewing."

Finally, Sarnelle acknowledged that he has been involved in approximately 200 medical malpractice cases as a consulting expert and witness, testifying at trial about 20 times, and in all of those cases he represented the plaintiffs. Sarnelle offered no opinion regarding the conduct of St. Mary's nursing staff.

On cross-examination, Sarnelle acknowledged that, depending on the cause of mesenteric ischemia, it can sometimes take days for a reasonably well-qualified surgeon to diagnose that death of the bowels has occurred. Sarnelle also admitted that the medical literature does not set out certain symptoms as "classic," but explained that the literature does not differentiate between arteriogram-induced mesenteric ischemia and other types, instead looking at "all comers." Sarnelle testified that he has performed intestinal revascularization surgery twice in his career, with one patient living and one dying. He estimated the mortality rate for such surgery to be more than 50%.

Grace McCallum, Snelson's nursing expert, testified that nurses are taught and practice the "nursing process," which is a critical thinking process that defines the standard of care that a nurse should follow. McCallum opined that the nursing process was not followed by the St. Mary's nursing staff on March 2, 1994, as evidenced by: (1) the failure to initiate a nursing care plan for Snelson; (2) the failure to request that another physician examine Snelson on the afternoon of March 2, when Kamm was unavailable and Snelson was experiencing abdominal pain; (3) the failure to request a physician after Snelson had a bloody bowel movement at 4 p.m.; (4) the failure to perform a new abdominal assessment following the bloody bowel movement; (5) the failure to document the effectiveness of the pain medication Demerol; (6) the lack of nursing notes regarding Kamm's 6 p.m. examination; (7) the failure to check all ordered vital signs during the evening of March 2; and (8) the failure to call Kamm after checking Snelson's vital signs around midnight on March 2. McCallum further opined that the failure to follow the nursing process increases the likelihood of an unfavorable outcome. However, McCallum testified that she had no opinion as to the proximate cause of Snelson's injury.

Dr. William Pyle, a cardiac, vascular and thoracic surgeon, was one of two medical experts presented by Kamm. Pyle testified that mesenteric ischemia is difficult to diagnose and that the ultimate mortality rate for patients suffering a mesenteric infarction is "in excess of 90 percent." Pyle opined that Kamm met the standard of care in his treatment of Snelson, explaining that, contrary to the assertions of Sarnelle, "there weren't enough findings or symptoms to justify surgery" on March 2. Indeed, after reading the radiologist's description of the procedure, Pyle believed that an internal dissection of the mesenteric artery occurred, rendering the artery like "wet tissue paper," and making revascularization impossible. Pyle noted that revascularization surgery was also not an option if the guide wire inserted during the arteriogram had produced a "showering" of small pieces of plaque and debris which gradually plugged up the artery.

Pyle further opined that Kamm complied with the standard of care in prescribing pain medication to Snelson, testifying that the doses were not high and that, in his experience, patients with mesenteric ischemia have excruciating pain that is intractable to pain medication. Pyle stated that, regardless of what caused the ischemia and regardless of when the revascularization surgery occurred, Snelson's intestines most likely could not have been saved. On cross-examination, Pyle agreed that abdominal pain out of proportion to the physical examination findings is present in many people with mesenteric ischemia. Other symptoms may be abdominal distension and the urge to have a bowel movement, and findings may include blood in the stools. Pyle believed that Kamm's concern about mesenteric insufficiency at 6 p.m. was appropriate because Snelson was then exhibiting some of the signs and symptoms of the condition. Pyle also agreed that revascularization was a known and

practiced technique and that, if possible causes of ischemia other than dissection were considered, the probability of revascularization existed, but was low.

Dr. Philip Donahue, a general surgeon testifying as Kamm's other medical expert, also concluded that Kamm did not breach the standard of care in his treatment of Snelson by failing to diagnose mesenteric ischemia, prescribing pain medication or failing to perform revascularization surgery on March 2, 1994. Donahue opined that earlier surgery was not warranted because, on the afternoon of March 2, there was "no evidence" of acute mesenteric ischemia, just a patient "with some nonspecific complaints." While Donahue testified it was "a possibility" that the superior mesenteric artery was totally blocked immediately following the arteriogram, he believed that it had occluded over time, basing his opinion, in part, on the fact that Snelson's pain diminished after the catheterization and overnight but re-emerged in the early morning.

Mary Delaney, St. Mary's nursing expert, testified that she was familiar with the standard of care applicable to nurses under circumstances similar to those involved here. Delaney opined that the nurses at St. Mary's did not violate the standard of care in treating or monitoring Snelson.

On the issue of damages, Snelson presented, *inter alia*, his own testimony and that of his treating physician, Dr. Robert Newlin. Newlin testified that the function of the small intestine is to do a significant part of the digestion of food. As a result of the March 3, 1994, surgery during which 95% of his small intestine was removed, Snelson suffers from "short bowel syndrome," a condition which creates diarrhea and a lack of ability to absorb sufficient nutrition and calories. Snelson must therefore rely on hyperalimentation, the intravenous infusion of a solution containing sufficient nutrients to

sustain him. The solution is infused into a vein in Snelson's upper chest through a catheter; the catheter is attached to a small machine that injects the nutrition directly into his body. The catheter is a foreign body and bacteria can easily grow on it. Snelson has therefore suffered repeated infections of his catheter site, some of which required hospitalization. Newlin opined that Snelson will continue to suffer from diarrhea and require hyperalimentation for the rest of his life. While Newlin could not say that Snelson's short bowel syndrome had reduced his life expectancy "to a great degree," due to his "various problems," including preexisting diabetes and arteriosclerosis, Snelson "could live another ten years."

Snelson testified that, after his release from the hospital, he took medical retirement from the railroad. He must be attached to the hyperalimentation device for 12 hours each day, usually from 9 p.m. to 9 a.m. When he unhooks the device, he must be close to a bathroom and remain there for 1 to 1½ hours. Snelson testified that he suffers from chronic diarrhea and must use the bathroom 15 to 20 times each day, consuming most of his waking hours. The hyperalimentation bag weighs between 10 and 15 pounds and must be kept refrigerated. There are numerous steps which must be taken to prepare the bag on a daily basis, including the entering of nutrients and vitamins; the preparation takes 20 to 30 minutes to perform. Sometimes the nutrient solution causes him pain as it enters the catheter, and he requires help from family members to maintain the catheter and catheter site. Snelson has spent a total of almost 1½ years in the hospital since June 1994, mostly for infections of his catheter site. A typical infection which leads to a hospital stay for a catheter change involves chills, a high fever and vomiting. He has had his catheter changed approximately 20 times; the catheter removal can be pain-

ful, as are the intravenous antibiotics used for these infections.

Snelson further testified that, because of the hyperalimentation, he must "pretty well stay at home." Although he can eat regular food, the portions must be small and he cannot eat certain foods, such as salad, green beans or corn, or even enjoy his favorite drink, Kool-Aid, because those items are eliminated by his body quickly and mostly unchanged. Snelson acknowledged that, even before the March 3, 1994, surgery, the arteriosclerosis made it hard to walk, restricting his ability to engage in daily activities. Snelson stated that he still hunts and travels to Minnesota to fish and to Indiana to see his daughter. However, if he chooses to do anything during the day, he must be attached to the bag during that time and then have the elimination process occur at night, possibly resulting in his soiling himself in bed.

In addition to this testimony, Snelson presented as economic damages a medical bill summary totaling $595,766.35, and a lost-wage claim of approximately 2 1/2 years with a 1993 wage rate of $32,130.85. For purposes of his disfigurement claim, Snelson showed the jury the catheter site on his chest where the hyperalimentation device attaches to his body.

Based on this evidence, the jury returned a verdict in Snelson's favor and against both Kamm and St. Mary's, awarding $7 million. Because the completed verdict form contained only the total damage award, the trial court instructed the jury to return to its deliberations in order to itemize the verdict. Approximately 20 minutes later, the jury returned with a verdict in the same amount, itemized as follows: (1) $600,000 for past medical expenses; (2) $1.1 million for future medical expenses; (3) $3 million for pain and suffering; (4) $2 million for loss of normal life; (5) $80,000 for lost earnings; and (6) $220,000 for disfigurement.

The appellate court majority affirmed the trial court's grant of a new trial on the issue of damages for Kamm and judgment *n.o.v.* for St. Mary's. Justice Cook, in dissent, would have reinstated the jury's award of $7 million in damages. The panel upheld the jury's verdict in favor of Snelson and against Kamm, rejecting Kamm's claims that a variety of trial errors had prejudiced him. This appeal followed.

## ANALYSIS

We first address Kamm's claims of trial error. Kamm argues that the trial court erred by granting Snelson's motion *in limine* barring him from cross-examining Snelson's expert, Sarnelle, regarding his relationship with a professional witness referral agency, Sappanaro, Inc. It is true that, generally, opposing counsel may probe bias, partisanship or financial interest of an expert witness on cross-examination. *Sears v. Rutishauser*, 102 Ill. 2d 402, 407 (1984). However, we agree with the appellate court that Kamm's failure to make an adequate offer of proof has resulted in a waiver of this issue on appeal. See *People v. Andrews*, 146 Ill. 2d 413, 422 (1992); *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 471 (2001).

When a motion *in limine* is granted, the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court. See *Sinclair*, 325 Ill. App. 3d at 471. Counsel makes an adequate offer of proof if he informs the trial court, with particularity, of the substance of the witness' anticipated answer; an offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate. *Andrews*, 146 Ill. 2d at 421. Here, a review of the record reveals no adequate offer of proof, only the following statement from Kamm's written response to the motion *in limine*: "The testimony of the experts for [Snelson] is that they have received other referrals from Sappanaro." Given this sparse information, there is no way for this

court to determine if the excluded evidence had any relevance to the proceeding. See *Andrews*, 146 Ill. 2d at 421 (an offer of proof serves no purpose if it does not demonstrate, both to the trial court and to reviewing courts, the admissibility of the testimony which was foreclosed). However, the record does show that the trial court allowed Kamm to cross-examine Sarnelle as to the frequency of his plaintiff-oriented testimony and to argue to the jury his alleged bias and financial interest. Thus, where counsel failed to explicitly state what the excluded testimony would reveal about Sarnelle's relationship with Sappanaro, Inc., we have no basis upon which to conclude that the trial court erred in restricting Kamm's cross-examination of Sarnelle. See *Holder v. Caselton*, 275 Ill. App. 3d 950, 955 (1995).

Next, Kamm argues that Sarnelle's testimony should be disregarded as lacking foundation. Kamm claims that Sarnelle failed "to ground his opinions in generally-accepted scientific principles."

The decision of whether to admit expert testimony is within the sound discretion of the trial court (*People v. Miller*, 173 Ill. 2d 167, 187 (1996)), and a ruling will not be reversed absent an abuse of that discretion (*People v. Reid*, 179 Ill. 2d 297, 313 (1997)). Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence. See *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999). Here, Sarnelle testified to his credentials and Kamm admits that they were sufficient to qualify Sarnelle as an expert.

At trial, Kamm failed to either object to the admissibility of Sarnelle's testimony or file a motion for an evidentiary hearing to determine its admissibility under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). See *Donaldson v. Central Illinois Public Service Co.*, 199 Ill.

2d 63, 76-77 (2002) (the admission of expert testimony is governed by the standards expressed in *Frye*, which dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is " 'sufficiently established to have gained general acceptance in the particular field in which it belongs' "), quoting *Frye*, 293 F. at 1014. Because the record shows that Kamm did not object to the underlying foundation of Sarnelle's testimony at trial, we find that this issue has been forfeited on appeal. See *People v. Moore*, 171 Ill. 2d 74, 98 (1996) (defendant waived *Frye* issue by failing to present expert testimony at *Frye* hearing); see also *Reed v. Northwestern Publishing Co.*, 124 Ill. 2d 495, 519 (1988) (a party waives evidentiary issues by failing to object at trial).

Citing *Kleiss v. Cassida*, 297 Ill. App. 3d 165, 174 (1998), and *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997), Kamm argues that, despite his failure to object to the complained-of testimony, the trial court should have entered judgment *n.o.v.* in his favor because of the alleged deficiencies in the testimony. We disagree. Both *Kleiss* and *Aguilera* are distinguishable and do not support Kamm's position.

In *Kleiss*, the plaintiff farmer alleged that his crops were damaged by the defendant's spraying of herbicide on nearby farms. The plaintiff's expert testified that the herbicide could have traveled two miles in the air to the plaintiff's property. However, the expert had no reasons whatsoever for his opinion other than "20 to 30 years experience." In affirming judgment *n.o.v.* for the defendant, the appellate court held that "[w]hen an expert testifies simply that plaintiff should win but is unable to support that conclusion with reasoned analysis, the expert's testimony is worthless, provides no assistance to the jury, and should be stricken." *Kleiss*, 297 Ill. App. 3d at 174. In contrast to the expert in *Kleiss*, Sarnelle's

testimony was replete with reasoned analysis supporting his opinions. Sarnelle carefully explained that his opinions were based on the clinical data contained in Snelson's medical records such as the onset and severity of pain, the vital signs, the appearance of blood in the stools, and that Snelson had been in the hospital having a procedure done in the area of his mesenteric artery when his problems began.

In *Aguilera*, the plaintiff's decedent was taken to the emergency room complaining of numbness on the right side of his body. About six or seven hours later, a CT scan was taken, revealing a brain hemorrhage. The patient died a few days later. The plaintiff presented two experts who testified that the emergency room physician's delay in taking the CT scan caused the decedent's death. It was the plaintiff's theory that a diagnosis of the condition would have triggered surgical intervention to prevent the decedent's death. However, on cross-examination the plaintiff's experts admitted that they would defer to a neurosurgeon as to whether surgery should have even been performed, yet the only neurosurgeons testifying in the case stated that surgery would not have been appropriate. The appellate court held that a directed verdict for the defendant was proper because, without supporting testimony from a neurosurgeon, the plaintiff's expert's testimony was insufficient to show that surgery would have occurred absent defendant's conduct. *Aguilera*, 293 Ill. App. 3d at 975. Here, in contrast, there was no question that Sarnelle was qualified to render the opinions he offered at trial, and there was no missing link failing to establish all of the elements of Snelson's case.

While Kamm contends that Sarnelle's opinions were not adequately supported, the basis for a witness' opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence, not its suf-

ficiency. See *National Bank of Monticello v. Doss*, 141 Ill. App. 3d 1065, 1072 (1986). Indeed, the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion. See *Wiegman*, 308 Ill. App. 3d at 799; *Treadwell v. Downey*, 209 Ill. App. 3d 999, 1003 (1991).

In *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981), this court held that an expert may give an opinion without disclosing the underlying facts or data. Rather, the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion. *Wilson*, 84 Ill. 2d at 194. Here, as the appellate court noted, "Kamm conducted a vigorous cross-examination of Sarnelle, challenging the bases and soundness of his opinions." 319 Ill. App. 3d at 136. Thus, it was up to Kamm to reveal any alleged deficiency in Sarnelle's testimony, a fact which the trial court recognized in denying Kamm's motion for judgment *n.o.v.*, stating: "[T]he criticism of Dr. Sarnelle by [Kamm] really goes to the weight of the evidence or testimony presented by him, and I believe that was all argued to the jury at the time. I think suffice it to say that the jury had the option of accepting the testimony of either side's expert witnesses ***." The trial court did not err in this regard.

Kamm further contends that the trial court erred by giving certain jury instructions at Snelson's request. However, the plaintiff has the right to have the jury clearly and fairly instructed on any theory supported by the evidence. *Leonardi v. Loyola University*, 168 Ill. 2d 83, 100 (1995). This court, in *Leonardi*, further stated:

"The question of what issues have been raised by the evidence is within the discretion of the trial court. The evidence may be slight; a reviewing court may not reweigh it or determine if it should lead to a particular conclusion. [Citation.] The test in determining the propriety of tendered instructions is whether the jury was fairly, fully,

and comprehensively informed as to the relevant principles, considering the instructions in their entirety." *Leonardi*, 168 Ill. 2d at 100.

Kamm first argues that Snelson's instruction No. 26, alleging Kamm's negligence in "prescribing pain medication to Robert Snelson once he was concerned with mesenteric insufficiency," was improper because Sarnelle never testified that Snelson suffered any injury from the prescription of pain medication. It was Snelson's theory at trial that administering pain medication in his case was a deviation from the standard of care because such medication made his condition more difficult to diagnose. Sarnelle testified that, in his opinion, based on a reasonable degree of medical and surgical certainty, no pain medication should have been given to a patient in Snelson's condition because it "may mask the findings." Additionally, Donahue and Kamm himself testified that Demerol, the pain medication which Kamm prescribed for Snelson, is a narcotic analgesic that can cause sedation and that the patient's condition can be reassessed only when the medication "wears off." Because the instant case involved a failure to timely diagnose, we find that there was sufficient support for Snelson's theory and that no abuse of the trial court's discretion occurred in giving this instruction. See *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 119 (1997) (to the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery).

Kamm further argues that he was prejudiced when, over his objection, the trial court gave Snelson's instructions based on Illinois Pattern Jury Instructions, Civil, Nos. 1.03, 1.04, B45.03.A, 30.01 (1995) (hereinafter IPI Civil (1995)). We first address Snelson's instruction No. 3, which provided: "A fact may be proved by circumstan-

tial evidence. Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the facts sought to be proved." IPI Civil (1995) No. 1.03. Kamm contends that there was no circumstantial evidence concerning him presented in this case. However, Kamm's expert, Donahue, testified that part of the basis for his opinion that the occlusion of the blood supply was not immediate was that Snelson's pain had diminished following the catheterization and then reemerged the next morning. Therefore, if Snelson's pain had not actually diminished overnight, the factual basis for Donahue's opinion was weakened. To that end, and because no direct evidence existed, Snelson presented circumstantial evidence as to his level of pain after midnight on March 2. Nurse Durbin testified that, while the medical records did not show Snelson's level of pain during the midnight shift assessment, at 12:45 a.m. Snelson received 100 milligrams of Demerol and that Snelson was therefore in pain at that time. In Illinois, in a civil case where any of the evidence is circumstantial a party is entitled to an instruction on circumstantial evidence. See *Kane v. Northwest Special Recreation Ass'n*, 155 Ill. App. 3d 624, 630 (1987). We therefore agree with the appellate court that the trial court, in the case at bar, did not err in giving IPI Civil (1995) No. 1.03.

Kamm further argues that IPI Civil (1995) No. 1.04, regarding a juror's life experiences, was improperly given. Snelson's instruction No. 4 provided: "In considering the evidence in this case you are not required to set aside your observation and experience in the affairs of life but you have a right to consider all the evidence in the light of your own observation and experience in the affairs of life." IPI Civil (1995) No. 1.04. Kamm argues that the jury should not have received this instruction because jurors may not attempt to resolve issues of medical malpractice from any personal knowledge they may pos-

sess. See IPI Civil (1995) No. 105.02. However, jurors are allowed to use their own observation and experience in assessing damages. See *Baird v. Chicago, Burlington & Quincy R.R. Co.*, 63 Ill. 2d 463, 472-73 (1976). Therefore, where the record clearly shows that the jurors were also instructed that they could not use their personal knowledge to determine the issues of professional negligence (see IPI Civil (1995) No. 105.02), the trial court did not abuse its discretion in giving IPI Civil (1995) No. 1.04.

Kamm also contends that the trial court erred by giving Snelson's instruction No. 20, a verdict form that provided, in pertinent part, as follows:

> "We find that the total amount of damages suffered by Robert Snelson as a proximate cause of the occurrence in question is itemized as follows:
>
> * * *
>
> The pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries ***." See IPI Civil (1995) Nos. B45.03.A, 30.05.

Kamm argues that there was no competent evidence to support an award for future pain and suffering, "as no party testified that [Snelson] was reasonably certain to experience pain and suffering in the future as a result of injuries allegedly caused by Dr. Kamm." However, at trial Snelson testified that he suffers from chronic diarrhea, that he sometimes experiences pain when the nutrients enter his body through the hyperalimentation catheter, and that he has experienced sickness and pain in association with the repeated infections and replacements of his catheter. This evidence was sufficient to warrant giving Snelson's instruction No. 20, and we therefore agree with the appellate court that the trial court did not abuse its discretion by submitting it to the jury. See *Leonardi*, 168 Ill. 2d at 100 (plaintiff has the right to have the jury clearly and fairly instructed on any theory supported by the evidence).

Finally, Kamm contends that the trial court erred by

giving a modified version of IPI Civil No. 30.01 that replaced "disability" as an element of damages with "loss of a normal life." We note that the portion of the instruction at issue is actually contained in IPI Civil (1995) No. 30.04, which is one of a number of "element of damages" phrases that may be inserted between the two paragraphs of IPI Civil No. 30.01 to complete that general damages instruction. See IPI Civil (1995) Nos. 30.01, 30.04, Notes on Use. Kamm argues that it was error to use this modified instruction, first proposed in *Smith v. City of Evanston*, 260 Ill. App. 3d 925 (1994), because the *Smith* version was not an approved instruction at the time of the instant trial, citing Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a)).

Rule 239(a) provides that whenever IPI contains an instruction applicable in a civil case, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law. 177 Ill. 2d R. 239(a). However, the notes on use for IPI Civil (1995) No. 30.04, which were available at the time of the 1999 trial, state: "If the trial court rules that the *Smith* case is applicable, then the phrase 'loss of a normal life' may be substituted for the term 'disability.' " IPI Civil (1995) No. 30.04, Notes on Use. Indeed, since the instant case has been on appeal, the IPI committee has formally adopted "loss of a normal life" as an accepted alternative to "disability" where the trial court determines that "loss of a normal life" more accurately describes the element of damages claimed and would be less confusing to the jury. See IPI Civil (2000) No. 30.04.01, Notes on Use. Here, the trial court, after lengthy discussion at the instructions conference, agreed with Snelson that the loss of a normal life instruction was appropriate. Thus, the trial court complied with Rule 239(a), because it gave the modified instruction believing it to more accurately

state the applicable law. Further, while the trial judge later stated, in ruling on posttrial motions, that he believed his decision to give the modified instruction was "in error," he reasoned that this was because "loss of a normal life is merely a component of a compensable damage element and not an independent element in and of itself." To the contrary, loss of a normal life has been recognized as a separate element of compensable damages in Illinois. See *Turner v. Williams*, 326 Ill. App. 3d 541, 551 (2001).

Kamm also claims prejudice from the use of the loss of a normal life instruction, arguing that "the extremely subjective nature of this element may have allowed the jury to decide issues in this case on the basis of sympathy rather than the testimony and evidence." Not only is this argument speculative, but it is repudiated by the addition of the element to the IPI instructions. See *Turner*, 326 Ill. App. 3d at 551 (the addition of IPI Civil (2000) No. 30.04.01, which allows either loss of a normal life or disability to be given as an instruction, depending on the nature of the evidence at trial, illustrates that the use of an instruction on loss of a normal life is not contrary to Illinois law). Therefore, where Kamm has failed to show error or prejudice in the giving of the modified instruction, we see no abuse of the trial court's discretion requiring reversal. See *Thompson v. MCA Distributing, Music Corp. of America*, 257 Ill. App. 3d 988, 991 (1994) (a new trial will be granted because of improper jury instructions only where the party has suffered serious prejudice from the offending instruction).

We next address Kamm's contention that the trial court erred by admitting into evidence Snelson's exhibit No. 16, a summary of his medical bills covering five years and many different providers, which totalled $595,766.35. Kamm claims that this exhibit included "all" of Snelson's medical bills incurred since entering St. Mary's on

March 2, 1994, and that no attempt was made to separate and distinguish the medical expenses he incurred for treatment of his preexisting health problems. However, we reject this claim based on Snelson's uncontradicted testimony that the summary included only bills received for medical services related to his intestinal problem, including those costs and problems associated with hyperalimentation.

Kamm also argues that the exhibit did not distinguish those medical expenses Snelson claimed were due to Kamm's alleged medical negligence from those Snelson would have incurred had a successful revascularization occurred. While Kamm contends that he objected to the "totality of the bills," we agree with the appellate court that the record reveals he specifically objected to only two bills contained in the summary: (1) the initial hospitalization bill from St. Mary's, for $52,814.59; and (2) a bill from Dr. Thomas Fulbright, a neurologist, for $471. The record further shows that Snelson's counsel suggested that the summary might be changed to delete Fulbright's bill and the objectionable portions of the hospital bill, and then the following colloquy occurred:

"MR. KEHART [Kamm's counsel]: I just wanted to preserve my objection.

THE COURT: At this point it is going to be admitted and then we will work out the details of what gets back to [the jury] later."

However, neither the trial court nor any of the parties ever raised the issue again and Snelson's exhibit No. 16 was admitted unchanged.

The admission of evidence is within the sound discretion of the trial court and a reviewing court will not reverse the trial court unless that discretion was clearly abused. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). We acknowledge that, "[i]n proving damages, the burden is on the plaintiff to establish a reasonable basis for computing damages." *Gill*, 157 Ill. 2d at 313. Here,

however, Snelson suggested deleting those medical charges that Kamm claimed were not causally related to his alleged negligence, and Kamm not only failed to accept this suggestion when it was made, but failed to reassert his objection later, allowing the unaltered exhibit to go to the jury. Accordingly, we hold that any valid objection Kamm may have had for admitting the medical bills into evidence was waived by his failure to make specific contemporary objections at trial so that any defect could have been cured. See *Janisco v. Kozloski*, 261 Ill. App. 3d 963, 966 (1994); see also *Simmons v. Garces*, 198 Ill. 2d 541, 567 (2002) (failure to object in a timely manner waives objections).

Kamm also argues that the jury verdict was "irrevocably tainted" because the jury considered "extrajudicial information." We reject this contention, as it is not supported by the record and is based solely on the jury's submission of the following question to the trial court during deliberations: "Was it possible a ~~Break~~ [*sic*] Brachial Arteriogram could have been preformed [*sic*] once Dr. Kamm was concerned with mecenteric [*sic*] insufficiency? or any procedure that could have shown blockage or reduced circulations [*sic*]?"

It is true that independent investigation by the jury may constitute error so prejudicial as to require reversal. See *People v. Holmes*, 69 Ill. 2d 507, 519 (1978); *Johnson v. Danville Cash & Carry Lumber Co.*, 200 Ill. App. 3d 196, 199 (1990). In order to set aside a verdict, however, the losing party must show "competent and credible evidence of an improper external influence on the jury." *Johnson*, 200 Ill. App. 3d at 199. In the instant case, we find, as did the appellate court, that Kamm does not support his claim with any evidence that the jury acted improperly. 319 Ill. App. 3d at 144. Rather, Kamm contends that the jury's question shows that it considered extraneous information because "[n]o witness, even Dr.

Sarnelle, opined that a second or 'brachial arteriogram' should have been attempted." However, Sarnelle did testify that, rather than a translumbar arteriogram, he preferred "a different route *** into the brachial artery, which is in the arm." Sarnelle further testified that when Kamm became concerned about ischemia following his examination of Snelson on March 2, he could have done an arteriogram where he would "go in through the arm to see the circulation." Kamm's claim must therefore be rejected because it is unsubstantiated by any "competent and credible" evidence and the record shows that the jury could have formulated its question based on the evidence presented at trial.

Kamm also argues that the jury's verdict was against the manifest weight of the evidence, contending that "all of the credible evidence on the applicable standard of care supported only a verdict in favor of Dr. Kamm." Again, we disagree.

It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 242 (1996); *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 189-90 (1990). Indeed, a reviewing court may reverse a jury verdict only if it is against the manifest weight of the evidence. *Rhodes*, 172 Ill. 2d at 242. A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995); *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).

Here, Snelson's medical expert, Sarnelle, testified, *inter alia*, that, based upon a reasonable degree of medical certainty, had there been surgery in a timely fashion on March 2, a large portion of Snelson's intestines could

have been saved and he would not require hyperalimentation to survive. In turn, Kamm's experts, Pyle and Donahue, testified that, even had revascularization been attempted on March 2, the surgery would not have been successful. As we earlier found, and contrary to Kamm's assertion, we see no "scientific poverty" in Sarnelle's testimony that would put the jury's verdict in doubt. Rather, as the appellate court so aptly stated:

> "This case involved a classic battle of the experts. Witnesses qualified in their fields stated their opinions and gave their reasons for those opinions. Not surprisingly, the plaintiff's experts did not agree with the defense experts. The jury needed to listen to the conflicting evidence and use its best judgment to determine where the truth could be found. The jury found in favor of Snelson and against Kamm, and this court 'should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way.' *Maple*, 151 Ill. 2d at 452-53." 319 Ill. App. 3d at 145.

We now address Snelson's argument that the trial court abused its discretion by ordering a new trial on the issue of damages. The determination of whether a new trial should be granted rests within the sound discretion of the trial court, whose ruling will not be reversed unless it reflects an abuse of that discretion. *Maple*, 151 Ill. 2d at 455; *Reidelberger v. Highland Body Shop, Inc.*, 83 Ill. 2d 545, 548 (1981). "If the trial judge, in the exercise of his discretion, finds that the verdict is against the manifest weight of the evidence, he should grant a new trial; on the other hand, where there is sufficient evidence to support the verdict of the jury, it constitutes an abuse of discretion for the trial court to grant a motion for a new trial." *Maple*, 151 Ill. 2d at 456.

Illinois courts have repeatedly held that the amount of damages to be assessed is peculiarly a question of fact for the jury to determine (*Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992); *Baird v. Chicago, Burl-*

*ington & Quincy R.R. Co.*, 63 Ill. 2d 463, 472-73 (1976)) and that great weight must be given to the jury's decision (see *Hastings v. Gulledge*, 272 Ill. App. 3d 861, 863-64 (1995); *McMahon v. Richard Gorazd, Inc.*, 135 Ill. App. 3d 211, 230 (1985)). The very nature of personal injury cases makes it impossible to establish a precise formula to determine whether a particular award is excessive or not. See *McMahon*, 135 Ill. App. 3d at 230. Additionally, judges are not free to reweigh the evidence simply because they may have arrived at a different verdict than the jury. *Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 97 (1991); see also *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 49 (1957) (the question of excessiveness is not to be determined by what we as judges think the damages should have been; the court has no right to substitute its judgment for that of the jury). Indeed, a court reviewing a jury's assessment of damages should not interfere unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered. *Gill v. Foster*, 157 Ill. 2d 304, 315 (1993). Given this precedent, we believe the trial court, in the instant case, abused its discretion in setting aside the jury's verdict as excessive.

When reviewing a question as to the adequacy of damages, the court must consider the record as a whole. See *Hastings*, 272 Ill. App. 3d at 864. Here, after reviewing the record in its entirety, it is clear that not only did the record support the jury's verdict, but the trial court's rationale for granting a new trial was, for the most part, faulty. The trial court's stated reasons for granting a new trial on damages may be summarized as follows: (1) there was error in giving the "loss of normal life" instruction; (2) the jury's question showed "[it was] attempting to base a decision on something other than the evidence presented"; (3) the jury's rapid itemization of the verdict

indicated "there could not have been any meaningful discussion as to the allocation"; (4) the pretrial settlement demand showed that Snelson's $10 million request in closing "was not made in good faith"; and (5) the amount of the verdict was based "at least in part on sympathy" and was unreasonable given Snelson's "surviving" and his "overall medical condition."

As to the first two bases, we have already found that the giving of the "loss of normal life" instruction was not error and that the jury's question was insufficient to show it was improperly considering extrajudicial information. Thus, contrary to the trial court's belief, these were not legitimate reasons for overturning the jury's verdict.

Next, while the trial court believed the jury took only an additional "five or ten minutes" to deliberate after the court explained to the jury that it had failed to itemize the damages, the record shows, and Kamm admits, that the jury actually took approximately 20 minutes to complete the itemized verdict form. The trial court's assumption that the lack of a lengthy delay meant "there could not have been any meaningful discussion as to the allocation" was speculation and ignored the possibility that the jury had previously deliberated on the individual damage elements but neglected to fill out that portion of the verdict form. Further, we agree with Snelson that it appears the elements of damages were itemized "in a thoughtful way," where the medical costs awarded were rounded to the nearest large whole number, the future medical awarded related to Snelson's current expenses of $7,000 to $10,000 per month for hyperalimentation, which will continue for the remainder of his 10-year life expectancy, and the lost-wages amount was taken directly from the closing argument suggestion. Therefore, because the calculations and proportions of the award demonstrate a strong relation to the evidence presented, the jury's determination cannot be against the manifest

weight of the evidence. See *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1138 (2000) (if a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand).

The trial court also stated that because Snelson had offered to settle the case at the start of trial for $500,000, his closing argument to the jury requesting $10 million was not made in good faith. However, the actual amount of Snelson's pretrial settlement offer was not $500,000, but rather $1 million, the limits of Kamm's policy. Additionally, while the trial court assumed that the settlement offer was based upon the predicted value of the case as determined by Snelson's counsel, we agree with Justice Cook's dissent that the demand for the policy limits and its subsequent withdrawal on the record were most likely made to lay a foundation for a possible "wrongful-refusal-to-settle claim." 319 Ill. App. 3d at 149 (Cook, J., dissenting). Thus, we believe the basis for the trial court's finding that Snelson's $10 million request was not made in good faith is erroneous.

Finally, we address the trial court's belief that the verdict was excessive given Snelson's medical condition and the sympathy it engendered. In granting Kamm a new trial on damages, the trial court stated, in pertinent part:

> "[T]he $7 million verdict *** under the circumstances of this case is definitely outside the range as what is fair and reasonable based on all of the evidence presented.
>
> The first reason that I believe that is the case is that the $2 million which was attributed to the loss of a normal life and the $3 million which was attributed to pain and suffering are excessive when viewed in the light of the plaintiff's overall medical condition which existed prior to this occurrence and his ability to function after this occurrence.
>
> *** *
>
> Furthermore, I believe [the experts] all testified that the condition suffered by the plaintiff *** [has] a very high degree of fatality. Here we have the plaintiff surviving.

* * *

"I think in the context of this case and this case only, with the plaintiff appearing in Court out of necessity as he has and with the feeding unit, which I in no way criticize plaintiff for because that's a fact of life, it is something that he has to have. I just think under the circumstances it was inevitable that the verdict was based at least in part on sympathy was [*sic*] the result here."

The evidentiary basis for the award of damages for loss of a normal life and pain and suffering was the loss of 95% of Snelson's small intestine, which has necessitated his dependence on hyperalimentation for survival and has resulted in his suffering from numerous infections and chronic diarrhea. The appellate court majority admits that "Snelson undeniably suffered a serious injury" and states that "[t]his issue is a close one." 319 Ill. App. 3d at 133. The majority nonetheless upholds the trial court's grant of a new trial on the issue of damages because Snelson's injury did not diminish his life expectancy, he acknowledged that his restricted ability to engage in daily activities was largely attributable to his preexisting physical problems, and he did not present evidence that his condition was likely to deteriorate in the future. 319 Ill. App. 3d at 133. We, however, believe that, even taking into consideration the majority's concerns, the injuries suffered by Snelson were shown by the evidence to be significant and devastating, and nothing has been presented that would compel us to conclude that the verdict was excessive.

We agree with Snelson that "[i]t is a vast oversimplification to state that [his] damages are limited because he still tries to live by occasionally going fishing." It is indisputable that the loss of Snelson's small intestine has radically affected his life and subjected him to phenomenal suffering. He has lost the ability to enjoy food and to consume many foods. He has had to endure bouts of diarrhea 15 to 20 times a day, every day, for over

eight years and counting. As Snelson further argued: "Every decision—to even leave the house—requires the trade-off to occur; must he have immediate access to a bathroom, or must he take the bag with him and then affect his ability to sleep that evening or, even worse, to soil his bed." Therefore, we find that, regardless of his prior medical condition, the jury's damage award for loss of a normal life was clearly demonstrated and supported by the evidence regarding the limitations on Snelson's freedom, mobility, and the change in nearly every element of his daily routine caused by the loss of his small intestine. Perhaps Snelson's own comment at trial made the point most succinctly: "When you are hooked up 12 hours a day, you don't have no days left." Similarly, we find the jury's award for pain and suffering was adequately supported by evidence of the infections, diarrhea, and hospitalizations caused by Snelson's "short bowel syndrome" and his need for hyperalimentation.

Additionally, we find that the trial court improperly considered Snelson's survival in determining the verdict to be excessive. The jury found that Kamm was guilty of negligence in his treatment of Snelson and the trial court denied Kamm's motion for judgment *n.o.v.* In determining whether the injuries Snelson did suffer merit the jury's damage award, it is irrelevant that the negligence did not cause Snelson's death.

In sum, an abuse of discretion will be found where there is no recognizable basis in the record to support the granting of a motion for a new trial. See *Greco v. Coleman*, 138 Ill. App. 3d 317, 322 (1985). Here, the jury's damage award was not against the manifest weight of the evidence. There were no trial errors that occurred that persuade this court that the award in the instant case was not fair and reasonable compensation for Snelson's injuries. Additionally, we have carefully scrutinized the record and do not find that the amount of the verdict

is so large as to be a result of passion and prejudice or a shock to the judicial conscience. See *Baird*, 63 Ill. 2d at 473. Therefore, we hold that the trial court abused its discretion in granting a new trial on damages.

Finally, we address Snelson's claim that the trial court erred in granting judgment *n.o.v.* for St. Mary's on the issue of proximate cause. Snelson acknowledges that he presented no expert testimony indicating that St. Mary's conduct was a proximate cause of his injury. He also acknowledges that Kamm testified that no act or omission of the nursing staff affected his course of treatment of Snelson. Nevertheless, Snelson argues that a question of fact as to proximate cause was sufficiently established by the evidence.

A motion for judgment *n.o.v.* presents a question of law and should be entered "in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). A decision on a motion for judgment *n.o.v.* is subject to *de novo* review by this court. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

In medical negligence cases against hospitals based on vicarious liability for the conduct of its nurses, it is necessary for a plaintiff to present expert testimony to establish the standard of care and that its breach was the cause of the plaintiff's injury. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 296 (2000). The rationale for requiring expert testimony is that a lay juror is not skilled in the profession and thus is not equipped to determine what constitutes reasonable care in professional conduct without the help of expert testimony. *Jones*, 191 Ill. 2d at 295.

Snelson in essence argues that St. Mary's nurses devi-

ated from the standard of care by failing to (1) advise Kamm at 6 p.m. that they had inserted a catheter at 3 p.m. and (2) advise Kamm that Snelson continued to experience some pain through the evening after Kamm left at 6 p.m. The problem with Snelson's argument is that there was no expert testimony presented at trial that either of these matters constituted a deviation from the nursing standard of care.

Snelson's first expert, Dr. Sarnelle, had no opinions about the nurses' conduct. Snelson's other expert, nurse McCallum, did not testify that either of the cited omissions amounted to a deviation from the standard of care. Although McCallum was critical of the nurses' failure to *document* the effect of the Demerol, she did not testify that this was a proximate cause of Snelson's injury in this case. Moreover, she did not testify that a failure to inform Kamm of pain before the closing of the "window of opportunity" was a deviation from the standard of care. She also acknowledged that she was not qualified to offer any opinion regarding the proximate cause of Snelson's injury.

McCallum testified about eight matters on which she was critical of the nurses. Conspicuous by its absence is any mention that it was a breach of the nursing standard of care to fail to orally advise Kamm that a catheter had been inserted at 3 p.m. This may be because the nurse notes and flow sheets to which Kamm had access at his 6 p.m. visit listed that a catheter had been inserted. It may also be because this was not something that was important for Kamm to know or for the nurses to communicate. Indeed, this theory of negligence based on what was or was not communicated about the catheter was not even a theory relied upon by Snelson at trial. At any rate, the general rule must be applied here—that except in very simple cases, expert testimony is necessary in professional negligence cases to establish the

standard of care and that its breach was the proximate cause of the plaintiff's injury. See *Jones*, 191 Ill. 2d at 296; *Addison v. Whittenberg*, 124 Ill. 2d 287, 297 (1988); see also *Natasi v. United Mine Workers of America Union Hospital*, 209 Ill. App. 3d 830, 837-38 (1991) (although nursing experts testified that failure to notify doctor was a deviation from standard of care and delays in diagnosis could cause "poorer ultimate results," there was no medical testimony to substantiate that omissions of nursing staff ultimately had any impact on outcome of treatment and therefore directed verdict for hospital was proper).

Nurse McCallum also testified that she was critical of the nursing staff's apparent failure to take Snelson's vital signs at 10 p.m. Snelson, however, does not explain how the failure to take vital signs at 10 p.m. helped to cause his injury. More importantly, there was no expert testimony that the conduct of the nurses on this matter was a proximate cause of Snelson's injury.

As previously mentioned, there was no expert testimony that the nurses' failure to inform Kamm of Snelson's complaints of pain constituted a breach of the standard of care and was a proximate cause of Snelson's injury. Kamm knew about Snelson's complaints of pain at the 6 p.m. visit. Kamm clearly anticipated that Snelson would continue to experience more pain and so he increased his dosage of Demerol from 50 milligrams to 100 milligrams, as needed. That Kamm was ordering Demerol instead of watching Snelson for pain was the criticism leveled against Kamm by Snelson's expert. That Kamm knew about Snelson's pain and yet was unconcerned about it beyond his ordering of Demerol means that the nurses' conduct on this matter could not have been the proximate cause of Snelson's injury even if there had been testimony that they deviated from the standard of care in failing to advise of pain.

The outcome of this case is controlled by our previ-

ous decision in *Gill v. Foster*, 157 Ill. 2d 304 (1993). There, the plaintiff was admitted to the hospital and surgery was performed. Several days after the surgery and while still in the hospital, the plaintiff complained to his surgeon that he was having chest pain. Two days later at the time of his discharge, the plaintiff complained to a nurse of chest pain. The discharge nurse, aware that the plaintiff had complained of pain before, did her own examination. She then told the plaintiff that something was wrong, but did not inform the treating physician. At the time of his discharge, the plaintiff actually had a herniation of his stomach into his chest, which required surgery at another hospital two weeks later.

The plaintiff alleged in *Gill* that the hospital deviated from the standard of care by failing to inform his treating physician that the plaintiff was complaining of pain at the time of his discharge. This court found, however, that even assuming that the nurse breached the standard of care in failing to inform the doctor of the plaintiff's complaint, it could not have been the proximate cause of delay in the correct diagnosis of the plaintiff's condition because the doctor had repeated contacts with the patient yet failed to diagnose the problem or examine him more thoroughly. *Gill*, 157 Ill. 2d at 310-311.

Similar to *Gill*, there was no indication in the present case that Kamm would have taken a different course of action had he been informed that Snelson had some pain after Kamm left at 6 p.m. Moreover, Snelson did not even allege that St. Mary's nurses deviated from the standard of care in failing to apprise Kamm of any further pain.

Snelson's suggestion that it is impossible for a plaintiff to prove causation where the doctor testifies that "he would not have acted differently regardless of what information could have been given him [by the nurses]" is a red herring for two reasons. First, Snelson mistakenly assumes that a doctor will not be willing to

tell the truth about whether the conduct of hospital nurses affected his decisionmaking ability. Second, a plaintiff would always be free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was a proximate cause of the plaintiff's injury in order to discredit a doctor's assertion that the nurse's omission did not affect his decisionmaking. See *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 26-27 (1999) (O'Mara Frossard, P.J., dissenting). In such a case, a factual dispute as to proximate cause would be created sufficient for the jury to resolve. We do not, of course, have such a factual dispute in the present case.

Snelson claims that he was "foreclosed" from presenting such evidence due to the appellate court majority's decision in *Seef*. We find no merit to this claim given that the trial in this case took place in June 1999, while the *Seef* decision was not filed until December 1999 (see *Seef*, 311 Ill. App. 3d 7).

To support his position that expert testimony establishing causation is not required, Snelson relies upon *Holton v. Memorial Hospital*, 176 Ill. 2d 95 (1997), and *Suttle v. Lake Forest Hospital*, 315 Ill. App. 3d 96 (2000). Neither of those cases, however, supports Snelson's position. *Holton* and *Suttle* do not set aside the requirement that a plaintiff present expert testimony asserting that a defendant hospital deviated from the standard of care and that *that deviation* was the proximate cause of the plaintiff's injury.

In *Holton*, the hospital's nursing staff did not inform the plaintiff's two treating physicians that the plaintiff's symptoms had progressed to partial paralysis. Unlike the present case, there was expert testimony in *Holton* to connect the nurses' particular deviation from the standard of care to the plaintiff's injury. The two treating doctors testified that they based their erroneous

diagnosis and treatment on the incomplete information supplied by the nurses. *Holton,* 176 Ill. 2d at 108-09.

To define what evidence is necessary to establish a jury question on proximate cause, *Holton* adopted the rule used by the appellate court in *Northern Trust Co. v. Louis A. Weiss Memorial Hospital,* 143 Ill. App. 3d 479, 487 (1986) (" '[e]vidence which shows to a reasonable [degree of medical] certainty that negligent delay in diagnosis or treatment *** lessened the effectiveness of treatment is sufficient to establish proximate cause' "), quoting *James v. United States,* 483 F. Supp. 581, 585 (N.D. Cal. 1980). *Holton,* 176 Ill. 2d at 115. In *Northern Trust,* the plaintiff's expert specifically testified that the hospital breached the standard of care in failing to have a "specially trained nurse" on call to monitor the plaintiff's meconium baby. The plaintiff connected *that* breach to the plaintiff's injury with expert testimony indicating that a specially trained nurse would have notified the doctor of the baby's problems, that if the doctor had been notified he would have undertaken certain diagnostic steps and treatment, and that the delay in treatment increased the probability of harm. *Northern Trust,* 143 Ill. App. 3d at 486-88. Thus, the appellate court rejected the hospital's argument that the jury verdict against the hospital should be reversed for lack of a connection between the hospital's omissions and the baby's brain injury. *Northern Trust,* 143 Ill. App. 3d at 487.

Neither *Holton* nor *Northern Trust* supports the notion that Snelson in this case should be excused from presenting expert testimony to show that the failure to notify Kamm of the insertion of the catheter and of continued pain amounted to deviations from the standard of care and that *those deviations* were a proximate cause of Snelson's injury. Unlike the present case, the plaintiffs in both of the cited cases presented expert evidence con-

necting a particular breach of the standard of care to the plaintiffs' injuries. Thus, neither case is helpful to Snelson.

Snelson attempts to fit the circumstances of this case under the shelter of the appellate court decision in *Suttle*, 315 Ill. App. 3d 96. There, the appellate court reversed a judgment *n.o.v.* for a hospital, holding that the question of whether the doctor's treatment of the plaintiff would have been the same if he had been accurately informed of the plaintiff's true condition was a question of fact for the jury. *Suttle*, however, is distinguishable and actually supports the judgments of both lower courts in this case.

In *Suttle*, the appellate court specifically noted that the plaintiff had presented expert testimony establishing the standard of care. The plaintiff also presented evidence of the hospital nurses' violations of the various provisions of the Illinois Administrative Code to establish the standard of care. The plaintiff further presented expert testimony that, to a reasonable degree of medical certainty, the hospital nurses' breaches of the standard of care led to a delayed diagnosis that was one of the proximate causes of the plaintiff's injuries. Moreover, the treating doctor testified that the hospital's breach resulted in a delay in his taking appropriate action. *Suttle*, 315 Ill. App. 3d at 104-05. Under these circumstances, the court concluded that the issues regarding the standard of care and proximate cause were questions of fact properly to be decided by the jury. *Suttle*, 315 Ill. App. 3d at 105. Unlike in *Suttle*, Snelson presented no expert testimony that the hospital breached the standard of care, resulting in a proximate cause of his injuries.

Despite Snelson's suggestion to the contrary, *Suttle* did not hold that a case should be submitted to the jury whenever a plaintiff presents some evidence that hospital nurses failed to communicate some information to a treating physician. Instead, *Suttle* merely distinguished

the case before it from this court's decision in *Gill*, 157 Ill. 2d 304, noting that summary judgment for the hospital in *Gill* was proper even though a nurse failed to inform the doctor that the patient being discharged from the hospital was complaining of chest pain because the doctor knew of the plaintiff's pain. *Suttle*, 315 Ill. App. 3d at 104. *Suttle* further noted, however, that unlike *Gill*, there was a factual dispute in the case before it as to what the doctor would have done if he had received the information assessing the patient's blood pressure. *Suttle*, 315 Ill. App. 3d at 104. This was because the plaintiff's expert explicitly testified that the lack of an assessment by the nurses led to a delayed diagnosis that was a proximate cause of the plaintiff's injury, while the treating doctor testified that his treatment would have been the same even if he knew of the condition of the placenta. *Suttle*, 315 Ill. App. 3d at 104.

Given the complete absence of expert evidence connecting any deviation from the standard of care by St. Mary's with Snelson's injury, we conclude that the evidence so overwhelmingly favored St. Mary's that no contrary verdict based on the evidence could ever stand. In entering judgment *n.o.v.* for St. Mary's, the trial judge stated that in his 21 years on the bench he had always given great deference to jury verdicts and had never entered a judgment *n.o.v.* before. He then explained that he was compelled to enter judgment *n.o.v.* for St. Mary's because Snelson completely failed to present any expert evidence that any of the claimed deviations from the nursing standard of care were the proximate cause of his injury. We agree with the judgments of the trial and appellate courts on this point. Accordingly, we affirm the judgment *n.o.v.* in favor of St. Mary's.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court, rejecting Kamm's claims of error in No. 91232,

50

is affirmed. As to Snelson's appeal, No. 91239, the appellate court and circuit court judgments are reversed with respect to Kamm and the cause is remanded to the circuit court of Macon County with directions to reinstate the $7 million award against Kamm. The trial court erred in granting Kamm a new trial on damages, as the jury's verdict in that regard was supported by the evidence, and we find no reason to overturn it. However, the appellate court and circuit court judgments with respect to the granting of judgment *n.o.v.* for St. Mary's are affirmed.

*No. 91232—Appellate court judgment affirmed.*

*No. 91239—Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded with directions.*

JUSTICE RARICK took no part in the consideration or decision of this case.