# Illinois Official Reports

## Appellate Court

*Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967

| | |
|---|---|
| Appellate Court Caption | LISA EID and MOHAMMED EID, as Special Administrators of the Estate of Miranda Eid, Deceased, and LISA EID, Individually, Plaintiffs-Appellants, v. LOYOLA UNIVERSITY MEDICAL CENTER, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-3967 |
| Opinion filed | December 2, 2016 |
| Opinion withdrawn | February 16, 2017 |
| Rehearing denied | February 16, 2017 |
| Filed | February 24, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-975; the Hon. Thomas L. Hogan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of Keith L. Davidson, of Chicago (Keith L. Davidson, of counsel), for appellants.<br><br>Swanson, Martin & Bell, LLP, of Chicago (Patricia S. Kocour, Catherine Weiler, and Shera D. Wiegler, of counsel), for appellee. |

Panel                      JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion.

## OPINION

¶ 1       After the death of Miranda Eid, a minor, her parents Mohammed and Lisa Eid brought suit against Loyola University Medical Center (Loyola), alleging negligent medical treatment of Miranda following her pacemaker replacement surgery. Mrs. Eid also sought damages for reckless infliction of emotional distress based on Loyola's nurses leaving medical tubing in place when Miranda's body was released for burial. The jury returned a verdict in favor of Loyola, and Mr. and Mrs. Eid appealed.

¶ 2       On appeal, Mr. and Mrs. Eid argue (1) the jury's verdict in favor of Loyola on the claims of medical negligence and reckless infliction of emotional distress was against the manifest weight of the evidence; (2) the circuit court erroneously upheld Loyola's claim of privilege under section 8-2101 of the Code of Civil Procedure (known as the Medical Studies Act) (735 ILCS 5/8-2101 *et seq.* (West 2012)) for information that was generated for the use of Loyola's peer review committee when a designee of that committee, pursuant to his authority under Loyola's bylaws, began an investigation of Miranda's treatment and instructed another member of the committee to assemble information concerning the incident; (3) the circuit court improperly instructed the jury on the law concerning the claim of reckless infliction of emotional distress; and (4) defense counsel's alleged improper remark during closing argument confused the jury, and the additional instructions the circuit court gave the jury did not cure the alleged confusion.

¶ 3       For the reasons that follow, we affirm the judgment of the circuit court.

¶ 4                             I. BACKGROUND

¶ 5       This appeal arises from the death of a two-year-old girl during her recovery from surgery that replaced her pacemaker. Miranda Eid was born in 2010 with a chromosomal abnormality that resulted in several anatomical defects, including an inverted heart structure and dextrocardia, a condition in which the heart is located in the right, rather than the left, chest. Miranda also had an atrioventricular block, a condition in which the impulses from the upper chambers of the heart are blocked from the lower chambers. To fix the block, Miranda underwent surgery when she was six days old to implant a pacemaker.

¶ 6       Two years later, Miranda needed a new pacemaker. On February 10, 2012, she had surgery at Loyola to replace the old pacemaker with a new one. During the surgery, a small laceration occurred on the surface of her heart. The laceration was sutured with a single stitch. Prior to closing the skin, the surgeons placed a tube in Miranda's chest to drain fluid. At the conclusion of the surgery, Miranda was stable and the surgeons advised Mr. and Mrs. Eid that the procedure had been successful.

¶ 7       Miranda was transferred to the pediatric intensive care unit at 2 p.m. A few hours later, Miranda became agitated. Nurse Matz gave Miranda a small dose of Versed, a sedative narcotic, to help her relax, as well as a fentanyl drip to help with any pain. About 8:20 p.m., nurse Ghera reported that Miranda appeared fussy and uncomfortable. Nurse Ghera then

administered a second small dose of Versed. About 8:35 p.m., nurse Ghera noticed that Miranda's breathing became shallow and irregular. Nurse Ghera immediately called nurse Matz to the room to assess any changes in Miranda's condition since nurse Matz had administered the earlier dose of Versed.

¶ 8 Nurses Matz and Ghera began giving Miranda oxygen at approximately 8:45 p.m. and called a code identifying an emergent situation with a patient. A code team arrived in less than a minute. Nurses Matz and Ghera administered medications and blood, performed compressions and tests, and protected Miranda's airway. Over the next two hours approximately 10 to 15 nurses, residents, and physicians conducted tests and worked to diagnose Miranda's adverse symptoms and resolve the problem.

¶ 9 Blood was drawn around 9:30 p.m. to evaluate Miranda's blood gas levels. The blood draw was tested three times. The first test showed levels so low they were unreadable and the next two tests showed abnormally low levels. Extremely low hemoglobin levels could be one indication of internal bleeding. The treating physicians, however, believed the test results were inaccurate and most likely the result of a sampling error.

¶ 10 A chest X-ray, ultrasound, and echocardiogram were done, and the physicians concluded that there was no evidence of blood or fluid around the heart. When a doctor checked Miranda's discharge tube and a nurse felt Miranda's stomach, the chest tube output was low and Miranda's chest was soft. Those findings corroborated the results of the image tests, which indicated no evidence of internal bleeding or fluid or blood around the heart.

¶ 11 The doctors decided not to perform a pericardiocentesis because there was no indication of fluid in Miranda's chest that needed to be withdrawn. The doctors also decided not to place Miranda on an extracorporeal membrane oxygenation (ECMO) machine because staff had already been performing chest compressions for over 40 minutes and the machine would have had little chance of being effective by the time a team was mobilized. Staff continued with resuscitation efforts until it became clear those efforts were futile. Miranda was declared dead at 10:46 p.m. on February 10, 2012.

¶ 12 Mr. and Mrs. Eid were informed of Miranda's death. A doctor escorted the Eids to Miranda's room, and nurse Ghera stayed with them to provide support. Mrs. Eid told the doctor and nurse Ghera that Mrs. Eid wanted the tubes removed from Miranda's body. The doctor said the tubes would be taken care of after the medical examiner called regarding an autopsy. Nurse Ghera said she would remove all the tubes she could take out, bathe Miranda, and carry her to the morgue personally.

¶ 13 According to Loyola's protocol, Miranda's death was reported to the medical examiner, who had the option to either order or waive an autopsy. If the medical examiner waived the autopsy, then all the tubes, dressings and tapes were supposed to be removed from the body unless a physician requested otherwise because a private autopsy would be conducted. Based on her experience, nurse Ghera testified that every child who died within 24 hours of admission was sent to the medical examiner for an autopsy. Nurse Ghera learned that the medical examiner had waived the autopsy but could not recall when she learned that information. Furthermore, the Eids declined a private autopsy when Miranda's primary pediatric cardiologist discussed the matter with them. After Mrs. Eid advised nurse Ghera that the private autopsy had been declined, nurse Ghera spoke with her supervisor, nurse Maturin. However, nurse Maturin instructed nurse Ghera not to remove the tubes due to some uncertainty regarding whether an autopsy would be conducted at another institution.

Consequently, nurse Ghera removed only the smaller tubes as allowed by the protocol concerning autopsies. Nurse Ghera placed white cloth tape over the endotracheal tube and washed Miranda's body with warm water. Then nurse Ghera wrapped Miranda's body in baby blankets, placed her in a plastic body bag, and carried her to the morgue around 4 a.m.

¶ 14      The next day, Miranda's body was transferred to a funeral home and placed in refrigeration. To respect the Muslim religious traditions, the male funeral director did not uncover or inspect the body. One day later, Mrs. Eid, female friends and family members, and female ritual washers arrived at the funeral home to perform a ritual washing. Mrs. Eid was crying as Miranda's body was removed from the body bag. Then Mrs. Eid saw that medical tubes were still in place and shouted that nurse Ghera had lied to her. The ritual washers removed a nose tube, and there was a little blood on it. When the washers removed the mouth tube, blood "began gushing" from Miranda's mouth. Mrs. Eid fell to her knees, became hysterical, and cried uncontrollably. The washers stuffed gauze into Miranda's mouth to stop the bleeding. No attempt was made to remove other tubes.

¶ 15      A few days later, Mrs. Eid contacted Loyola and demanded to speak to nurse Ghera about the unremoved tubes. Nurse Ghera explained that her supervisor had instructed her not to remove the tubes, so she removed what she could, washed Miranda, and carried her to the morgue. Mrs. Eid said she did not believe her.

¶ 16      Kathleen Ostrowski was Loyola's risk manager and a member of Loyola's Medical Care Evaluation and Analysis Committee (MCEAC), which conducts peer reviews of hospital deaths to reduce morbidity and mortality. The morning after Miranda's death, Ms. Ostrowski began contacting individuals to preserve records. Ms. Ostrowski then paged Dr. Robert Cherry, the chairperson of the MCEAC, to advise him of the incident. Dr. Cherry returned Ms. Ostrowski's page at 10:51 a.m. and instructed her to investigate the incident on the MCEAC's behalf from a quality perspective.

¶ 17      The Eids sued Loyola for medical negligence and reckless infliction of emotional distress. During discovery, Loyola refused to produce 13 pages of documents, claiming privilege under the Medical Studies Act. To support their claim of privilege, Loyola submitted the affidavits of Dr. Cherry and Ms. Ostrowski. Dr. Cherry averred that he was very familiar with Loyola's bylaws, rules, and polices. He explained that the MCEAC typically met once a week and was responsible for evaluating the quality of patient care with the goals of reducing morbidity and mortality and improving patient care. To carry out these responsibilities, the MCEAC directed and empowered one or more individuals to assemble information about an incident and the areas of specialty involved and to report that information back to the MCEAC for its use in evaluating and improving the quality of patient care.

¶ 18      Dr. Cherry stated that, as the chairperson of the MCEAC, he frequently, and within the scope of his authority and responsibilities, directed and empowered risk manager Ms. Ostrowski and other designees of the MCEAC to perform these duties. Typically, the risk manager or other MCEAC designee would contact Dr. Cherry to request this directive after learning about the occurrence of an event that could have potential for MCEAC review. Dr. Cherry then would determine whether an MCEAC investigation was warranted and give the directive if indicated. Dr. Cherry averred that this protocol was followed when Ms. Ostrowski contacted him about Miranda's case, he determined that an investigation was warranted, and he then directed Ms. Ostrowski to assemble information for the MCEAC's use. Ms. Ostrowski's affidavit was consistent with Dr. Cherry's affidavit.

¶ 19    The trial court upheld Loyola's claim of privilege under the Medical Studies Act for the disputed 13 pages of documents. The trial court stated it had reviewed Loyola's bylaws extensively and noted that section 2.1 of the medical staff bylaws specifically indicated that the chief medical officer of the hospital was permitted to begin an investigation. At the time of the incident at issue here, Dr. Cherry was the chief medical officer of Loyola and the chairperson of Loyola's MCEAC, in addition to other positions he held at Loyola.

¶ 20    The jury trial commenced with opening statements on October 8, 2014, and closing argument concluded on November 3, 2014. During the course of the trial, the jury heard testimony from multiple experts from both sides, as well as testimony from the nurses and doctors who had provided care to Miranda.

¶ 21    The Eids' experts testified that the standard of care required the doctors to surgically reexplore Miranda to stop or prevent internal bleeding or cardiac tamponade, perform a pericardiocentesis to remove excess fluid from Miranda's chest, perform a portable chest X-ray to ensure the endotracheal tube remained in the correct place, and have an ECMO machine readily available. The Eids medical negligence claim focused primarily on the blood samples taken at 9:30 p.m. The Eids' experts testified that the blood samples indicated Miranda was bleeding internally and therefore surgery should have been performed to stop the bleeding. For example, Dr. Cooper, the Eids' pediatric cardiology expert, opined that Miranda died from an internal clot and that the images taken did not rule out an internal bleed. Dr. Harvey Klein, the Eids' hematology expert, testified that Miranda likely bled to death. However, Dr. Cooper acknowledged there was no documented evidence of a clot or bleeding around Miranda's heart, and Dr. Klein offered no opinion to explain why no blood was seen on the echocardiogram. Furthermore, Dr. Cynthia Rigsby, the Eids' pediatric radiology expert, testified that echocardiography (which Loyola's doctors did use in this case) was the imaging "gold standard" to look for fluid around the heart.

¶ 22    Loyola's expert Dr. Ronald Bronicki, a pediatric intensive care specialist, testified the treatment rendered to Miranda was appropriate under the circumstances because there was no evidence of excess fluid in her chest or proof of cardiac tamponade and, consequently, the other measures suggested by the Eids' experts would not have helped. Dr. Jonathon Berlin, Loyola's expert in diagnostic radiology, testified there was no evidence of fluid in the chest X-ray, and if there was a significant amount of blood or fluid in Miranda's chest, it would have shown up on the X-ray. Dr. Leonard Valentino, Loyola's expert in pediatric hematology, opined there was no evidence in this case of cardiac tamponade because none of the imaging indicated any fluid around the heart, and there were no changes in vital signs that indicated pericardial tamponade. He also opined that the tested blood samples were not accurate and were likely diluted by intravenous fluids given to Miranda.

¶ 23    Concerning Mrs. Eid's claim of reckless infliction of emotional distress, the testimony of her psychologists and psychiatrist indicated she suffered from post-traumatic stress disorder and major depression as a result of Miranda's death and the incident at the funeral home. Furthermore, nurse Audrey Berman testified as the Eids' nursing expert regarding nurse Ghera's actions that resulted in Miranda's body being released to the funeral home with some medical tubes still in place. On cross-examination, nurse Berman acknowledged that it would have been inappropriate to remove the tubes if there was some uncertainty about the possibility of an autopsy. She also stated that it would have been inappropriate for nurse Ghera to remove the tubes after her supervisor had instructed her not to remove all the tubes. Nurse Ghera

testified that her supervisor had some uncertainty about whether an autopsy ultimately would be performed at another institution. Nurse Ghera further testified that Loyola's policy required the tubes to remain in place until the issue of whether an autopsy would be conducted had been decided.

¶ 24    The jury returned a verdict in favor of Loyola on both the medical negligence and reckless infliction of emotional distress claims. The trial court entered judgment on the jury's verdict and denied the Eids' posttrial motion, and the Eids appealed.

¶ 25                                II. ANALYSIS
¶ 26                         A. Medical Negligence Claim
¶ 27    The Eids argue a new trial is warranted because the jury's verdict for Loyola on the Eids' medical negligence claim was against the manifest weight of the evidence. The Eids contend all the credible evidence concerning the treatment rendered by Loyola's physicians and staff supported only a verdict that they violated the standard of care. Specifically, the Eids argue that the three blood tests done after 9:30 p.m. were clear and obvious evidence of internal bleeding and indicated that reexploratory surgery should have been conducted.

¶ 28    A reviewing court will reverse a jury verdict only if it is against the manifest weight of the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence. *Id*. It is well established that the reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury. *Id*. Furthermore, the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999).

¶ 29    Loyola presented the testimony of the treating physicians to establish the course of action they took when Miranda displayed signs of decline. Loyola also presented the testimony of three experts, and Dr. Bronicki opined that the treatment rendered by the physicians was appropriate under the circumstances. Echocardiography was considered the "gold standard" for determining whether there was fluid around the heart, and none of the doctors who reviewed the echocardiogram saw any signs of fluid that could cause cardiac tamponade. Further, the chest X-ray showed no evidence of fluid that would cause cardiac tamponade or indicate internal bleeding. Based on both of those imaging technologies, Loyola's physicians decided not risk either reexploration, which Miranda might not have been able to tolerate, or a pericardiocentesis, which potentially could have punctured her heart. Our review of the record establishes that Loyola presented more than enough evidence to establish that a verdict in its favor would be a reasonable conclusion.

¶ 30    In *Snelson*, our supreme court affirmed the appellate court's refusal to overturn a jury verdict in a medical negligence claim where there had been opposing testimony among the experts. *Snelson*, 204 Ill. 2d at 36. To support its decision, the supreme court cited the "aptly stated" reasoning of the appellate court:

    " 'This case involved a classic battle of the experts. Witnesses qualified in their fields stated their opinions and gave their reasons for those opinions. Not surprisingly, the plaintiff's experts did not agree with the defense experts. The jury needed to listen

to the conflicting evidence and use its best judgment to determine where the truth could be found.' " *Id.* (quoting *Snelson v. Kamm*, 319 Ill. App. 3d 116, 145 (2001)).

¶ 31    Similar to *Snelson*, this appeal involved a jury trial where each side presented expert testimony, witnesses, and evidence to support their cases. The jury heard the expert testimony from both sides and ultimately decided Loyola was not negligent. We have reviewed the record and find that the jury's verdict is supported by evidence presented at the trial. Accordingly, we decline the Eids' invitation to "usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence." *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). We conclude that the jury's verdict in favor of Loyola on the medical negligence claim was not against the manifest weight of the evidence.

¶ 32                              B. Reckless Infliction of Emotional Distress

¶ 33    The Eids argue that a new trial is warranted because the jury's verdict for Loyola on their reckless infliction of emotional distress claim was against the manifest weight of the evidence. The Eids argue that Mrs. Eid suffered severe emotional distress when she witnessed the removal of medical tubes from Miranda's body at the funeral home, and this distress occurred because nurse Ghera recklessly, and contrary to Loyola's protocol, left medical tubes in Miranda's body after it had clearly been determined that neither a medical examiner autopsy nor a private autopsy would be performed.

¶ 34    For Loyola to be liable for reckless infliction of emotional distress, the Eids had the burden to prove that (1) Loyola's conduct was extreme and outrageous, (2) Loyola knew that there was a high probability that its conduct would cause severe emotional distress, and (3) Loyola's conduct in fact caused severe emotional distress. *Doe v. Calumet City*, 161 Ill. 2d 374, 392 (1994). Our review of the record establishes that a jury finding in favor of Loyola on either or both of the first two elements was not unreasonable, arbitrary, or contrary to the evidence.

¶ 35    Contrary to the Eids' assertion on appeal, we cannot conclude that it was clearly evident that any miscommunication between or among Loyola's nurses and the Eids concerning the removal of the tubes constituted extreme and outrageous conduct. Nurse Ghera testified that although Mrs. Eid told her they declined the option of a private autopsy, the supervising nurse instructed nurse Ghera to leave the tubes in place because there was still some uncertainty regarding whether an autopsy would be conducted at another institution. Although nurse Ghera acknowledged that she eventually learned the medical examiner had waived the autopsy, she could not remember when she learned that information. Even the Eids' nursing expert acknowledged that it would have been improper for the nurses to remove the medical tubes if there was some uncertainty about the possibility of an autopsy. Loyola presented evidence that nurse Ghera followed her supervisor's orders and reasonably believed the orders had a legitimate purpose. A jury reasonably could have concluded that the nurses did not engage in extreme or outrageous conduct when they exercised caution and left the tubes in place due to confusion or uncertainty about the possibility of an autopsy.

¶ 36    Furthermore, there was evidence to support a jury's determination that Loyola's nurses did not know there was a high probability that their conduct would cause severe emotional distress. The Eids were escorted to Miranda's room shortly after her death and before her body was washed and wrapped in blankets. The tubes in Miranda's body were apparent at that time, and Mrs. Eid asked the doctor and nurse Ghera to remove the tubes. Nevertheless, there was no evidence indicating that the condition of Miranda's body in the hospital caused Mrs. Eid severe

- 7 -

emotional distress. Furthermore, there was no evidence showing the nurses were familiar with the ritual washing tradition, knew the staff of the funeral home would not tend to the body prior to the ritual washing, or knew Mrs. Eid would watch as the ritual washers removed Miranda's unembalmed body from the body bag and removed medical tubes. Accordingly, a jury reasonably could determine that the nurses did not know there was a high probability that leaving the tubes in place would cause Mrs. Eid severe emotional distress.

¶ 37    The jury heard the testimony of the Eids' nursing expert and the testimony of nurses Ghera and Maturin regarding the uncertainty about the possibility of an autopsy. The issues of fact concerning the reckless infliction of emotional distress claim were fairly submitted, tried, and determined by the jury, and our review of the record shows that the jury's verdict in favor of Loyola was not against the manifest weight of the evidence.

¶ 38                                  C. The Medical Studies Act

¶ 39    Next, the Eids argue the trial court erred by finding that the privilege pursuant to section 8-2101 of the Medical Studies Act (Act) (735 ILCS 5/8-2101 (West 2012)) applied to 13 pages of documents created by Ms. Ostrowski. Loyola responds that the privilege applies because the plain language of the Act provides that the privilege covers all information of peer review committees or their designees, except the patient's medical records, used in the course of internal quality control to reduce morbidity or mortality, or to improve patient care. Loyola argues that its bylaws authorized Dr. Cherry to start the investigation on behalf of the MCEAC and instruct Ms. Ostrowski, a member of the MCEAC, to gather information concerning Miranda's treatment from a quality control perspective for the use of the MCEAC as part of its peer review process. Based on our review of the plain language and purpose of the Act and the relevant case law, we affirm the trial court's ruling that the Act's privilege covered the disputed documents.

¶ 40    In this appeal, different standards of review apply to the two questions before this court on this issue. The legal determination of whether the privilege under the Act applies to information generated by designees of a peer review committee is a question of law, which we review *de novo*. See *Niven v. Siqueira*, 109 Ill. 2d 357, 368 (1985). However, we review under the manifest weight of the evidence standard the trial court's factual determination that the specific communications at issue here—*i.e.*, the information Ms. Ostrowski generated after Dr. Cherry determined that an investigation was warranted and directed her to begin the investigation on behalf of the peer review committee—were part of a peer review study covered by the Act. See *id*. The burden of establishing the applicability of an evidentiary privilege rests with the party who seeks to invoke it. *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 41 (1993).

¶ 41    Initially, we consider *de novo* whether the Act applies to information generated by a designee of the peer review committee for the use of the peer review committee in the course of internal quality control. In answering this question, we are guided by the rules of statutory construction. The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature, and the most reliable indication of the legislature's intent is the plain language of the statute. *Metzger v. DaRosa*, 209 Ill. 2d 30, 34-35 (2004). When the statute's language is clear, it will be given effect without resort to other aids of statutory construction. *Id*. at 35. This court will not depart from the plain language of a statute by reading into it

exceptions, limitations, or conditions that conflict with the express legislative intent. *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002).

¶ 42     The Act provides, in pertinent part:

> "*All information, interviews, reports, statements, memoranda, recommendations*, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, *or other data of \*\*\* committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees*, Utilization Review Committees, Credential Committees and Executive Committees, *or their designees \*\*\**, *used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care \*\*\* shall be privileged*, strictly confidential and shall be used only for \*\*\* the evaluation and improvement of quality care \*\*\*." (Emphases added.) 735 ILCS 5/8-2101 (West 2012).

The Act further provides that such privileged material "shall not be admissible as evidence \*\*\* in any court or before any tribunal, board, agency or person." 735 ILCS 5/8-2102 (West 2012).

¶ 43     In 1995, the legislature amended the Act to add the phrase "or their designees" to modify the entities, including peer review committees, that could create or generate information protected by the Act's privilege. Pub. Act 89-393, § 15 (eff. Aug. 20, 1995). A correct grammatical reading of the plain language of the statute indicates the legislature intended to include within its scope information generated by a designee of the peer review committee for that committee's use in the course of internal quality control. See Merriam-Webster's Collegiate Dictionary 313 (10th ed. 1998) (defining *designee* as "one who is designated," and *designate* as "to indicate and set apart for a specific purpose, office, or duty"). As such, the information generated by the investigation—commenced by Dr. Cherry's directive, on behalf of the MCEAC, to Ms. Ostrowski to gather information on the incident from an internal quality control perspective—may fall within the scope of the Act if Loyola met its burden to establish that Dr. Cherry and Ms. Ostrowski properly constituted designees of the MCEAC.

¶ 44     Accordingly, the next question before us is whether the trial judge's finding that Dr. Cherry and Ms. Ostrowski were designees under the Act was against the manifest weight of the evidence. This court has held that the Act protects against disclosure of the mechanisms of the peer review process, including information gathering and deliberations leading to the ultimate decision rendered by a peer review committee, but does not protect against the discovery of information generated before the peer review process begins or information generated after the peer review process ends. See *Roach*, 157 Ill. 2d at 40 (where the committee involved consists of members of a hospital's medical staff, the committee must be engaged in the peer review process before the statutory privilege is applicable); *Grandi v. Shah*, 261 Ill. App. 3d 551, 557 (1994) (the Act's privilege did not apply to the conversations of the hospital administrator with the treating physician and treating nurse to investigate a patient's complaint because, even if those conversations were part of the hospital's internal review process, the evidence failed to establish that the administrator was acting on behalf of any peer review committee when he spoke with the treating physician and nurse).

¶ 45     The purpose of the Act "is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Roach*, 157 Ill. 2d at 40. The Act was never intended to shield hospitals from potential liability. *Id*. at 42 The Act does not protect any information of a hospital's medical

staff that is used for the purposes of peer review; rather, the Act protects the information of the peer review committees or their designees. See *id*. at 39; 735 ILCS 5/8-2101 (West 2012). The simple act of furnishing a peer review committee with earlier-acquired information is not sufficient to cloak that information with the statutory privilege, otherwise a hospital would be able to effectively insulate from disclosure virtually all adverse facts known to its medical staff, except for those matters actually contained in the patient's medical records. *Roach*, 157 Ill. 2d at 41-42. Consistent with the Act's purpose to reduce hospital morbidity and mortality and improve patient care, a designee of a peer review committee who is authorized to gather information for the committee's use can act expeditiously, while the matter is still fresh in the minds of the participants, without waiting for the whole committee to convene to formally declare the start of an investigation.

¶ 46    In *Roach*, the plaintiffs alleged, *inter alia*, that the hospital negligently delayed providing adequate anesthesia to the expectant mother for her emergency cesarean section. The hospital argued that certain statements concerning the delay between the treating nurse anesthetist, the hospital's chief of anesthesiology (chief), and a nursing supervisor in the obstetrics department were privileged under the Act. *Id*. at 36-38. Specifically, the chief spoke with the obstetrics nursing supervisor a few times in the 7 to 10 day period after the incident, and then the chief momentarily stopped the treating nurse anesthetist in the hallway and remarked that the delay occurred because new secretaries did not know the proper way to page the anesthesia team. *Id*.

¶ 47    There was no dispute that the chief's discussions with the obstetrics nursing supervisor "had nothing to do with any physician peer-review committee," and the court found that the chief's remarks to the treating anesthetist, which occurred before the monthly meeting that apprised the department of the incident, "were not 'information of' any committee, peer-review or otherwise." (Emphasis omitted.) *Id*. at 40. The court explained that the information the chief obtained from his conversations with the obstetrics nursing supervisor "was not transformed into 'information of' the anesthesiology department merely because [the chief] reported the incident to that body sometime later." *Id*. at 41. The court also rejected the notion that the chief's "investigation was tantamount to an investigation by 'a committee,' itself." *Id*. at 42. Specifically, the court noted that the hospital's bylaws contained no provision conferring on someone in the chief's position, or any individual, the authority to act for the department in conducting interviews or investigations preliminary to the review process. *Id*. at 43.

¶ 48    After *Roach* was issued in 1993, the legislature amended the Act to add the phrase "or their designees" to modify the entities, including peer review committees, that could create or generate information protected by the Act's privilege. Pub. Act 89-393, § 15 (eff. Aug. 20, 1995). This amendment has somewhat qualified *Roach*'s discussion about the type of information that may constitute "information of" a peer review committee because, since August 1995, the plain language of the statute provides that the Act's privilege applies to information generated by a designee of a peer review committee for the use of the peer review committee in matters concerning morbidity, mortality, and the improvement of patient care.

¶ 49    The Eids cite *Roach* and several post-1995 appellate court cases that followed *Roach* to support the proposition that the Act's privilege does not apply to information generated before the peer review committee, acting as a whole, either became aware of the incident at issue or was already engaged in the peer review process. However, the Eids' reliance on those cases is misplaced, because the statute was amended after *Roach* was issued, and the cases citing

*Roach* for that proposition either failed to acknowledge and analyze the 1995 amendment that added the "or their designees" phrase to the statute or did not address a situation involving an individual authorized to act on behalf of a peer review committee. See, e.g., *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 402-04 (1998) (no analysis of the 1995 amendment when addressing the 1996 version of the statute); *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 550 (2004) (documents containing the statements of an assisted living facility's nurses and staff, which were prepared in conjunction with the peer review committee's proceeding, were not privileged under the Act because there was no evidence the committee requested the statements); *Anderson v. Rush-Copley Medical Center, Inc.*, 385 Ill. App. 3d 167, 175-76 (2008) (medical journal articles that were not written by or for the peer review committee were privileged under the Act because the committee requested the articles, which were used as a resource in conducting its review); *Kopolovic v. Shah*, 2012 IL App (2d) 110383, ¶ 28 (no acknowledgment or analysis of the 1995 amendment to support the determination that an anesthesiologist's memorandum to the board of directors of a day surgery center was not privileged under the Act because there was no evidence the board, acting as a whole, knew of the incident or was already engaged in the peer review process).

¶ 50    The Eids also argue on appeal that the trial court erroneously construed the language of the bylaws and those bylaws did not authorize an individual in Dr. Cherry's position to commence an investigation on behalf of the MCEAC. According to the transcript of the May 2014 hearing on Loyola's claim of privilege, the trial court stated that it had reviewed the policies and bylaws provided by Loyola "extensively over the weekend" and found that section 2.1 of the bylaws specifically authorized the chief medical officer of the hospital, which position Dr. Cherry held at the time of the incident in question, to begin a peer review investigation.

¶ 51    The Eids have failed to include in the record on appeal a copy of Loyola's bylaws. In order to support a claim of error on appeal, the appellant has the burden to present a sufficiently complete record. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Where the record lacks information of evidence presented at a hearing, it is presumed that the court heard adequate evidence to support the decision that was rendered unless the record indicates otherwise. *Skaggs v. Junis*, 28 Ill. 2d 199, 201-02 (1963). Accordingly, based on the record before us, we presume that section 2.1 of Loyola's bylaws authorized Dr. Cherry to commence an investigation on behalf of the MCEAC and direct a designee of the committee to assemble information for the committee's review.

¶ 52    The Eids also argue the 13 pages of disputed documents generated by Ms. Ostrowski were not *used* by the MCEAC as part of its peer review process. We disagree. The Act protects "the nature and content of an internal review process." *Zajac v. St. Mary of Nazareth Hospital Center*, 212 Ill. App. 3d 779, 788 (1991). Here, the affidavits of Dr. Cherry and Ms. Ostrowski established that she reported to Dr. Cherry the information gathered during her investigation as a designee of the MCEAC, she also reported that information to another member of the MCEAC, and Dr. Cherry recalled that the matter was presented to the full MCEAC. Thus, the information generated by Ms. Ostrowski at Dr. Cherry's directive pursuant to his authority under the bylaws as a designee of the MCEAC contributed to the MCEAC's deliberations in that they were obtained as part of the information-gathering process and were considered prior to the conclusion of the MCEAC's review. Any disclosure of those 13 disputed pages would have improperly revealed the MCEAC's internal review process. See *Anderson*, 385 Ill. App. 3d at 176 (medical journal articles requested by and submitted to the peer review committee for

its use during its deliberations were privileged under the Act, and the disclosure of these articles improperly revealed the committee's internal review process).

¶ 53    The affidavits of Dr. Cherry and Ms. Ostrowski established that Loyola's MCEAC was a peer review committee covered by the Act. Moreover, after Ms. Ostrowski informed Dr. Cherry that Miranda's case might warrant peer review proceedings, Dr. Cherry, at 10:51 a.m., utilized his authority to commence the MCEAC's investigation and directed Ms. Ostrowski as the MCEAC's designee to gather information from an internal quality control perspective for the use of the MCEAC. Loyola already produced the documents Ms. Ostrowski created prior to Dr. Cherry's 10:51 a.m. directive to conduct the MCEAC investigation; Loyola asserted the Act's privilege applied only to the documents generated by Ms. Ostrowski after she obtained Dr. Cherry's directive on behalf of the committee. Consequently, we conclude the trial court's determination that the 13 pages of documents were privileged under the Act was not against the manifest weight of the evidence.

¶ 54                                    D. Jury Instructions

¶ 55    The Eids argue the trial court abused its discretion when it gave the jury an instruction, which was submitted by Loyola and objected to by the Eids, concerning the definition of extreme and outrageous conduct. Specifically, the Eids contend Loyola's instruction was unnecessary and distorted the elements of the reckless infliction of emotion distress tort by (1) turning the permissive factors concerning the intensity and duration of the alleged emotional distress into controlling factors in the determination of whether the emotional distress was severe, (2) making the determination of whether the conduct was extreme and outrageous dependent on the determination of whether the conduct caused severe emotional distress, (3) including the concept of unendurability to define severe emotional distress, and (4) restricting the jurors from exercising common sense to determine whether defendant's conduct was outrageous.

¶ 56    Generally, a trial court's decision to grant or deny an instruction is reviewed for an abuse of discretion, which considers whether, taken as a whole, the instructions fairly and correctly stated the law and were sufficiently clear so as not to mislead. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). However, when the question is whether the applicable law was conveyed accurately, the issue is a question of law, and our standard of review is *de novo*. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. We review the Eids' assertion that the disputed instruction was unnecessary for an abuse of discretion and review their challenge to the applicable law conveyed by the instruction *de novo*.

¶ 57    Supreme Court Rule 239(a) requires that "[w]henever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law." Ill. S. Ct. R. 239(a) (eff. Jan. 1, 1999). A non-IPI instruction may be used if the court determines that the pattern instruction does not accurately state the law. Ill. S. Ct. R. 239(b) (eff. Jan. 1, 1999). In a situation where our pattern instructions are inadequate and additional instruction is appropriate, a non-IPI instruction is permissible if it is simple, brief, impartial, and nonargumentative. *Dillon*, 199 Ill. 2d at 505. "Where a unique factual situation, or a point of law, is presented, a nonpattern instruction may be given if it is accurate and will have no improper effect on the jury." *Id.* at 505-06.

¶ 58    Here, there was no civil IPI instruction defining the tort of reckless infliction of emotional distress. The trial court gave the following non-IPI instruction submitted by Loyola:

> "Under the reckless infliction of emotional distress claim, extreme and outrageous conduct means conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency in a civilized community, and is such that the intensity and duration of the distress inflicted is so severe that no reasonable person of ordinary sensibilities could be expected to endure it."

¶ 59    The language in this instruction was taken from our supreme court's opinion in *McGrath v. Fahey*, 126 Ill. 2d 78, 86 (1988) (citing Restatement (Second) of Torts § 46 cmt. j, at 77-78 (1965)). We hold that the trial court did not err by giving the jury this instruction, which was an accurate statement of Illinois law, had no improper effect on the jury and was neither misleading nor confusing.

¶ 60                                 E. Closing Argument

¶ 61    Finally, the Eids argue Loyola made improper comments during closing argument that confused the jury, and the additional instructions the trial court gave the jury did not cure the alleged confusion. Specifically, the Eids argue that Loyola's counsel blamed unidentified hospital employees for failing to remove the tubes from Miranda's body before it was released to the funeral home, and this argument violated the trial court's ruling prohibiting any arguments attributing liability to unidentified Loyola employees.

¶ 62    "Attorneys are afforded wide latitude during closing argument and may comment and argue on the evidence and any inference that may be fairly drawn from that evidence." *Zickuhr v. Ericsson, Inc.*, 2011 IL App (1st) 103430, ¶ 72. A new trial based on improper closing argument is allowed only when the comments resulted in substantial prejudice to the opposing party; generally, however, the court sufficiently cures any prejudice when it sustains a timely objection and instructs the jury to disregard the improper comment. *Id*. ¶ 75.

¶ 63    According to the record, the trial court directed Loyola's counsel to refrain from arguing that anyone at Loyola other than nurses Ghera and Maturin acted recklessly by leaving the tubes in place. If Loyola failed to abide by this ruling, then the trial court would give the jury two instructions submitted by the Eids concerning causation. Specifically, the trial court would instruct the jury that (1) the right to decide whether or not to have a private autopsy of Miranda belonged solely to Mr. and Mrs. Eid, and if the jury found the Eids informed Loyola that they declined the right to request a private autopsy, then it was no defense that any official or department of Loyola or any other person might have wanted any medical tubes or equipment to be left in Miranda's body for purposes of a private autopsy and (2) the right to decide whether or not to have a medical examiner's autopsy belonged solely to the office of the medical examiner, and if the jury found that the office of the medical examiner informed Loyola that it declined to perform that autopsy, then it was no defense that any official or department of Loyola or any other person might have wanted any medical tubes or equipment to be left in Miranda's body for purposes of a medical examiner's autopsy.

¶ 64    During Loyola's closing argument, counsel stated that it was an unfortunate mistake that Miranda's body was released from Loyola with the tubes in place, but the nurses neither believed the autopsy matter was resolved by the time they went off duty nor anticipated that Mrs. Eid would see Miranda's body with the tubes in place. Further, although counsel did not blame the ritual washers, Loyola's people had no involvement in the chain of events that

- 13 -

occurred at the funeral home. Although counsel had no answers for the jury about what happened after the nurses went off duty, their efforts did not successfully ensure that the tubes would be removed before Miranda's body was released to the funeral home, so the jury was asked to evaluate the conduct only of the nurses and "nobody else's [conduct] at Loyola."

¶ 65 Although the trial court overruled the Eids' objection, the court admonished Loyola's counsel for stating that the people at the funeral home should have done something, asked what difference it would have made, and stated that it was not proximate cause. The trial court gave the jury the two instructions submitted by the Eids, and their counsel discussed those instructions during his rebuttal argument.

¶ 66 Assuming, *arguendo*, that Loyola's argument improperly suggested that someone else at Loyola other than nurses Ghera and Maturin should have done something to prevent the release of Miranda's body to the funeral home with the tubes still in place, the Eids' argument concerning jury confusion lacks merit. The two additional instructions the trial court gave the jury and the rebuttal argument of the Eids' counsel clarified that Loyola could not claim that some potential request for an autopsy was a defense for the nurses' conduct of leaving the tubes in Miranda's body, if the jury found from its consideration of all the evidence that the medical examiner and the Eids had made it known to Loyola that they declined their rights to request an autopsy. Based on our review of both attorneys' entire closing arguments and all the jury instructions, we conclude the Eids did not suffer substantial prejudice from the closing argument remark of Loyola's counsel.

¶ 67                              III. CONCLUSION

¶ 68 We conclude that the jury verdict in favor of Loyola on the claims of medical negligence and reckless infliction of emotional distress was not against the manifest weight of the evidence; the Act's privilege applied to the information generated by Ms. Ostrowski after Dr. Cherry determined that an investigation by the MCEAC was warranted and directed her to investigate the incident on behalf of the MCEAC; the non-IPI jury instruction concerning the tort of reckless infliction of emotional distress was accurate, clear, and did not mislead the jury; and the Eids did not suffer substantial prejudice from remarks by Loyola's counsel during closing argument. Accordingly, we affirm the judgment of the circuit court.

¶ 69 Affirmed.

- 14 -