**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220201-U

Order filed November 8, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| DIJANA RIS, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| ADVOCATE HEALTH AND HOSPITALS | ) | |
| CORPORATION d/b/a ADVOCATE GOOD | ) | Appeal No. 3-22-0201 |
| SAMARITAN HOSPITAL, a corporation; LI | ) | Circuit No. 16-L-613 |
| ZHANG, M.D., S.C., a corporation; and LI | ) | |
| ZHANG, M.D., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | The Honorable |
| (Advocate Health and Hospitals Corporation, | ) | David E. Schwartz, |
| Defendant-Appellee). | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice McDade concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Jury's verdict in favor of hospital in medical malpractice action was neither inconsistent with special interrogatory nor against the manifest weight of the evidence where evidence was presented at trial that the physician liable for plaintiff's injuries was not an agent of the hospital when she committed malpractice.

¶ 2    Plaintiff Dijana Ris filed a medical malpractice complaint against defendant Dr. Li Zhang, Zhang's medical corporation and defendant Advocate Health and Hospitals Corp (Advocate), d/b/a Advocate Good Samaritan Hospital (Good Samaritan). During trial, the court entered an order voluntarily dismissing Dr. Zhang's medical corporation as a defendant. Following trial, the jury found Dr. Zhang liable and Advocate not liable for plaintiff's injuries. Plaintiff filed a motion for a new trial or judgment notwithstanding the verdict, which the trial court denied. Plaintiff appeals, arguing that the jury's verdict should be set aside because it was (1) inconsistent with the jury's answer to a special interrogatory, and (2) against the manifest weight of the evidence. We affirm.

¶ 3                                    BACKGROUND

¶ 4    On August 25, 2009, plaintiff Dijana Ris went to the emergency room of Good Samaritan complaining of severe headaches. She was admitted to the hospital and seen by Dr. Steven Beltran, an internal medicine physician. Dr. Beltran ordered testing, including magnetic resonance imaging (MRI) of plaintiff's brain. According to the MRI report, completed by Dr. James Scheuer, an "abnormal signal" or "mass" was present in the right anterior frontal lobe of plaintiff's brain, which could possibly be a "nonenhancing slow-growing glioma." A glioma is a brain tumor.

¶ 5    Dr. Beltran sought a consultation from defendant Dr. Li Zhang, a neurologist. Dr. Zhang performed a neurological exam of plaintiff and reviewed plaintiff's MRI. Dr. Zhang determined that the "abnormal signal" or "mass" identified in the MRI was most likely scar tissue from an old head injury. Dr. Zhang instructed plaintiff to follow up with her for a repeat MRI in three months.

¶ 6    A second MRI of plaintiff was performed in December 2009. Dr. Siddiqi, the radiologist who interpreted the MRI, recommended that "if no intervention is planned at this time, a follow up should be obtained in six months to exclude a low-grade glioma." Dr. Zhang did not order any intervention, such as a biopsy, or a follow-up MRI.

2

¶ 7 Plaintiff did not have another MRI until July 2014, after she hit her head at work. Dr. Siddiqi interpreted that MRI and found "diffuse abnormality" throughout plaintiff's brain. He determined that the abnormal signal in plaintiff's brain "has significantly progressed since December 2009 where it was localized to the right frontal lobe." Because of the presence of tumors throughout plaintiff's brain, the only treatment option was whole-brain radiation. Plaintiff underwent five weeks of whole-brain radiation in 2014.

¶ 8 In July 2016, plaintiff filed a complaint against Dr. Zhang, her medical corporation and Advocate. Plaintiff alleged medical negligence and lack of informed consent against Dr. Zhang, her corporation and Advocate, alleging that Dr. Zhang was an agent of Advocate. A jury trial was held over 10 days in June 2021.

¶ 9 Dr. Zhang testified that when she treated plaintiff, she had a private neurology practice located in Lisle where she saw patients. After first seeing plaintiff at Good Samaritan in August 2009, Dr. Zhang saw plaintiff every time thereafter at her office in Lisle. When Dr. Zhang saw plaintiff at Good Samaritan in 2009, Dr. Zhang was wearing a lab coat and an identification badge, which both contained her name and the Advocate logo. Dr. Zhang testified that she had seen plaintiff at the hospital before August 2009, because plaintiff worked there.

¶ 10 Dr. Zhang testified that Advocate gave her a plaque in 2009 for being an "Exemplary Physician," which Dr. Zhang hung in the waiting room of her practice. At Good Samaritan, a photograph of Dr. Zhang, as well as awards she had won are displayed in a hallway. In April 2010, Dr. Zhang received a "Physician Recognition Winner" award from Good Samaritan, which contains Good Samaritan's name and corporate logo. That award was initially hung at the hospital, but after a few months, the hospital provided it to Dr. Zhang, who hung it in the waiting room of

her practice. In 2012, Good Samaritan gave Dr. Zhang a clock with Good Samaritan's name and corporate logo on it. Dr. Zhang's staff hung the clock in the waiting room of her practice.

¶ 11    Dr. Zhang testified that she saw plaintiff at her private neurology practice on January 5, 2010, following plaintiff's December 2009 MRI. Dr. Zhang said, based on her custom and practice, she would have reviewed the MRI and report with plaintiff, but Dr. Zhang did not remember the conversation she had with plaintiff. Dr. Zhang testified that plaintiff's second MRI "reassured" her that the abnormal findings were consistent with a prior head injury and not a tumor.

¶ 12    Dr. Zhang agreed she was not employing a "watchful waiting" strategy with plaintiff. If she had been, she would have ordered additional MRIs. Dr. Zhang saw plaintiff in her office in Lisle several times a year from 2010 to 2014. Dr. Zhang treated plaintiff with medication for migraines. Dr. Zhang testified that she "never thought [plaintiff] had glioma." Dr. Zhang testified that if she suspected plaintiff had glioma, she would have referred her to a neurosurgeon. Dr. Zhang agreed that the standard of care required her to refer a patient with suspected glioma to a neurosurgeon.

¶ 13    At trial, plaintiff presented the testimony of three experts in various fields of neurology: Dr. Steven Arkin, a neurologist; Dr. Manesh Aghi, a neurosurgeon; and Dr. Tracy Batchelor, a neuro-oncologist. All three agreed that plaintiff's August and December 2009 MRIs showed a brain tumor that was confined to her right frontal lobe. All three experts also agreed that if Dr. Zhang had identified and treated the tumor in a timely manner, it would not have spread outside plaintiff's right frontal lobe, and whole-brain radiation, which caused plaintiff neurocognitive deficits, would have been unnecessary.

¶ 14    Dr. Arkin testified that Dr. Zhang deviated from the standard of care by failing to (1) recognize the possible existence of a tumor; (2) discuss with plaintiff the differential diagnosis

4

contained in the 2009 MRI reports; (3) refer plaintiff to a neurosurgeon from 2009 to 2014; and/or (4) perform "serial surveillance on the lesion." Dr. Arkin opined that Dr. Zhang's failure to properly diagnose and treat plaintiff allowed plaintiff's tumor to grow outside the right frontal lobe and into other areas of plaintiff's brain.

¶ 15     Dr. Aghi testified that a neurosurgeon complying with the standard of care would do one of three things: (1) perform a surgical resection, (2) perform a biopsy, or (3) follow a "watching and waiting" approach. Dr. Aghi testified that a "watching and waiting" strategy "requires far more imaging than what occurred in this particular case." "Watching and waiting" requires repeat MRIs at "tight intervals" of six months or less. He testified that "no watching and waiting was done" in this case. Dr. Aghi agreed that if left untreated, glioma will spread and invade other areas of the brain, which is what happened to plaintiff. Dr. Aghi believed plaintiff's tumor was "amenable to surgical resection" in 2009 and early 2010. Dr. Aghi agreed "there was no harm done to [plaintiff] from August to December [2009], based on the MRI images and her options as of December or January of 2010." Dr. Aghi concluded that the delay in diagnosing and treating plaintiff's brain tumor caused plaintiff's neurocognitive dysfunction and shortened her life expectancy.

¶ 16     Dr. Batchelor testified that the standard of care for a neuro-oncologist with a patient who had an MRI like plaintiff's in August 2009 required referral to a neurosurgeon. In his opinion, the "most likely diagnosis" based on plaintiff's August 2009 MRI was a tumor. Based on the appearance of plaintiff's tumor in August 2009, Dr. Batchelor would have recommended "at a minimum a biopsy, if not a resection." Based on the results of the biopsy, he would have expected "a gross total resection" to be performed. Such a procedure would have prevented plaintiff's tumor from growing and extending to multiple areas of the brain. Dr. Batchelor testified that "a lack of treatment between 2009 and 2014" led to the growth of plaintiff's tumor, causing it to infiltrate

5

multiple lobes of the brain. Dr. Batchelor admitted that if plaintiff's tumor had been surgically resected, plaintiff would likely have a recurrence sometime during her lifetime but that upon recurrence, plaintiff would be treated with focal radiation, which has "[f]ar less risk" than whole-brain radiation.

¶ 17      Dr. Gregg Zoarski, a neuroradiologist, testified that an "abnormal signal" was present in the right frontal area of plaintiff's brain based on the August 2009 MRI. Dr. Zoarski opined that the tumor was contained to plaintiff's right frontal lobe based on plaintiff's August and December 2009 MRIs. Dr. Zoarski testified that, based on plaintiff's 2014 MRI, tumors had spread throughout plaintiff's brain to the left and right parietal lobes, left and right temporal lobes and left and right occipital lobes.

¶ 18      Plaintiff also presented the testimony of Dr. Nancy Landre, a neuropsychologist. She testified that it is common for patients who have undergone whole-brain radiation to have cognitive symptoms affecting thinking, memory, processing speed, and executive functions. Dr. Landre administered several tests to plaintiff in 2017 and 2020, which showed plaintiff was "mildly impaired" in psychomotor speed, "moderately impaired" in mental flexibility, and "significantly impaired" in non-verbal problem solving, encoding new information, and memory. Dr. Landre concluded that plaintiff "demonstrated consistent evidence of memory impairment." Dr. Landre opined that plaintiff suffered cognitive injuries because of whole-brain radiation that are "permanent" and will worsen as she ages.

¶ 19      Plaintiff's son, Slavisa Ris, was 25 years old at the time of trial. He testified that he lives with plaintiff. Prior to 2014, plaintiff was independent and took care of the household herself. Now, Slavisa takes care of the household finances because plaintiff "forgets sometimes what bills she's paid." He testified that plaintiff suffers from "short-term memory problems." Slavisa is

uncomfortable with plaintiff being home alone because of her memory problems. He testified that plaintiff does not go anywhere alone because "she can't drive, she gets dizzy, [and] her concentration is bad."

¶ 20    Plaintiff's sister, Marjana Balic, testified that she and plaintiff began working at Good Samaritan in May 2009. Marjana testified that plaintiff has experienced "a lot of memory problems" since her whole-brain radiation. Plaintiff spends very little time home alone because Marjana feels "it's not safe to leave her home alone." Plaintiff has suffered falls and forgotten to take her medication.

¶ 21    Plaintiff testified that she came to the United States from Bosnia in 2003, with her son and husband. At that time, she spoke no English. She began working at Kohl's in 2004, where she learned English. In 2009, she obtained a second job at Good Samaritan. When she was hired at Good Samaritan, she was given a badge with Advocate's logo, her photo and her name. She was required to wear her badge whenever she was working. When she was working at Good Samaritan, plaintiff saw a picture of Dr. Zhang on the wall. Plaintiff also reported seeing Dr. Zhang "every time" she worked at Good Samaritan and often heard Dr. Zhang being paged.

¶ 22    When plaintiff went to the emergency room at Good Samaritan on August 25, 2009, she was not a patient of Dr. Zhang's. Plaintiff did not ask to see Dr. Zhang. When plaintiff saw Dr. Zhang in the hospital, Dr. Zhang wore a coat with the Advocate logo on it and had a badge, like hers, with the Advocate logo on it. Dr. Zhang never told plaintiff she was not an employee of Good Samaritan. Plaintiff testified that she believed Dr. Zhang was an employee of Good Samaritan from 2009 to 2014. Plaintiff testified that when she went to Dr. Zhang's office in Lisle she saw "stuff *** with Advocate's logo" and "a lot of stuff *** from Advocate." She specifically remembered seeing a clock with Advocate's name and logo on it.

7

¶ 23          Plaintiff agreed that when she went to Good Samaritan on August 25, 2009, she signed a consent form containing the following language:

> "I acknowledge and fully understand that some or all of the physicians who provide medical services to me at the hospital are not employees or agents of the hospital, but rather independent practitioners on the hospital medical staff who are permitted to use the hospital facilities to render medical care and treatment. Non-employed physicians may include but are not limited to those practicing emergency medicine, trauma, cardiology, obstetrics, surgery, radiology, anesthesia, pathology and other specialties. Your decision to seek medical care is not based on any understanding, representation, advertising, implications, or inferences that the physicians who are treating you are actual employees or agents of the hospital."

Plaintiff testified she did not read the form before signing it. Plaintiff did not dispute that she signed six other consent forms from November 8, 2003, to June 25, 2009, containing the same language, but she claimed she never read them.

¶ 24          When plaintiff went to Dr. Zhang's office in January 2010, she brought an electronic copy of her December 2009 MRI. Plaintiff looked at the images with Dr. Zhang but did not understand them. Dr. Zhang did not show her the MRI report and did not tell her that the radiologist recommended she have a repeat MRI in six months. Plaintiff said Dr. Zhang told her she did not have cancer or a tumor but had "chronic migraines" and treated her for those. Dr. Zhang never mentioned plaintiff having another MRI after December 2009.

¶ 25          Plaintiff continued to work at Good Samaritan until 2014, and repeatedly saw Dr. Zhang at the hospital wearing her badge and lab coat. Plaintiff talked to Dr. Zhang in the hallways about her health problems. When plaintiff underwent whole-brain radiation in 2014, she said she had

8

"[n]o energy," felt weak, was "nauseous all the time", and could barely walk. Plaintiff testified she no longer works, never leaves the house alone, and has to rely on others.

¶ 26 Dr. Keith Schaible, a neurosurgeon, testified he performed a biopsy on plaintiff's brain tumor on August 1, 2014. Dr. Schaible testified that surgery was not an option for plaintiff in 2014 because the tumor "involved areas of the brain that were not accessible to surgery without significant risk in terms of neurological function."

¶ 27 After plaintiff's witnesses testified, Dr. Zhang and Advocate filed motions for a directed verdict, which the trial court denied. Plaintiff orally moved that Dr. Zhang's medical corporation be voluntarily dismissed from the action. The trial court granted that motion and entered an order voluntarily dismissing Li Zhang, M.D., S.C. as a defendant.

¶ 28 Dr. Zhang and Advocate presented the testimony of several experts: Dr. Terence Roberts, a radiation oncologist; Dr. Joel Meyer, a neuroradiologist; Dr. Herbert Engelhard, a neurosurgeon; and Dr. Martin Kelly Nicholas, a neuro-oncologist. They all testified that plaintiff's August 2009 and December 2009 MRIs were essentially the same and did not show a single tumor contained in the right frontal lobe but showed "gliomatis cerebri," tumor cells spread throughout plaintiff's brain.

¶ 29 Dr. Roberts testified that "it is not possible" that plaintiff's tumor was localized to one lobe in 2009 based on the presence of tumors in many other lobes in 2014. He testified that surgical intervention in 2009 would not have changed the outcome for plaintiff because it "would have only treated a portion of her tumor." He opined that if the tumor in the right frontal lobe had been removed in 2009, other tumors would have appeared and required whole-brain radiation. Dr. Roberts testified that the five-year delay, from 2009 to 2014, in identifying and treating plaintiff's

9

brain tumor did not alter plaintiff's outcome, change her treatment, or change her "overall survival chances."

¶ 30     Dr. Meyer testified that plaintiff's MRI from August 2009 showed "abnormalities outside the right frontal lobe." He opined that in 2009, plaintiff's tumor was "[n]ot amenable to be taken out" because it was in multiple areas of her brain. He further opined that Dr. Zhang's delay in diagnosing plaintiff's tumor did not cause any harm to plaintiff because "she has a very bad diagnosis, and if it were me, I wouldn't want to know about it until I absolutely had to because it's noncurable." He agreed that "[m]ore likely than not" plaintiff suffered injury from whole-brain radiation because she "suffered brain volume loss," which means her brain shrunk.

¶ 31     Dr. Engelhard testified that the standard of care did not require a biopsy or surgical resection of plaintiff's tumor in 2009. Dr. Engelhard opined that observation or "watchful waiting" was a reasonable course of action at that time. He agreed that watchful waiting required "serial MRI scans" every three to twelve months. He testified that "an aggressive surgical resection" in 2009 would not have cured plaintiff because it would not have removed all the tumor cells. He testified that plaintiff's 2009 MRIs showed that "[t]his is not a curable tumor." Dr. Engelhard opined that aggressive resection in 2009 or 2010 would not have altered plaintiff's outcome because plaintiff "would have winded up needing radiation therapy and chemotherapy anyway."

¶ 32     Dr. Nicholas agreed that observation, biopsy and resection surgery are all reasonable options for someone who presented like plaintiff with low-grade glioma in 2009. He explained that surgical resection does not cure a patient like plaintiff because "there will be cells left behind" that will grow. Dr. Nicholas opined that Dr. Zhang violated the standard of care "when she failed to follow up on the MRI scans" but did not violate the standard of care in any other way.

10

¶ 33     Prior to deliberations, the jury was given an instruction about apparent agency, which stated:

> "Under certain circumstances, the liability of a party may arise from an act or omission of that party's apparent agent.
>
> In the present case, Plaintiff, Dijana Ris has sued Defendant, Advocate *** as the principal and Defendant, Li Zhang, M.D. as its apparent agent. Defendant, Advocate *** denies that any apparent agency existed.
>
> In order for an apparent agency relationship to have existed, Plaintiff Dijana Ris must prove the following:
>
> First, that Defendant, Advocate *** held itself out as a provider of complete medical care and that Plaintiff Dijana Ris neither knew or should have known that the defendant, Li Zhang, M.D. was not an agent or employee of Defendant, Advocate ***.
>
> Second, that Plaintiff Dijana Ris did not choose Defendant, Li Zhang, but relied upon Defendant, Advocate *** to provide complete medical care.
>
> If you find that Defendant, Li Zhang, M.D. was the apparent agent of Defendant, Advocate *** at the time of the occurrence, and that if you find that Defendant Li Zhang, M.D. is liable, then both Defendant, Advocate *** and Defendant Li Zhang, M.D. are liable for the acts of Defendant Li Zhang, M.D.
>
> If you find that Defendant, Li Zhang, M.D. is not liable, then neither Defendant Advocate *** nor Defendant, Li Zhang, M.D. are liable ***.
>
> If you find that Defendant, Li Zhang, M.D. is liable, but that she was not the apparent agent of Defendant, Advocate *** at the time of the occurrence, then Defendant, Advocate *** is not liable for the acts of Defendant, Li Zhang, M.D."

11

¶ 34 Over plaintiff's objection, Advocate tendered two special interrogatories to the court, which the court submitted to the jury: (1) "Was Li Zhang, M.D. the apparent agent of Advocate *** in 2009?"; and (2) "Was Li Zhang, M.D. the apparent agent of Advocate *** from 2010 through 2014?"

¶ 35 During deliberations, the jury presented the court with several written questions: (1) "What is the time of occurrence on pg. 18 [the agency instruction]?"; (2) "Can you define apparent agency?"; and (3) "Can we mark yes for a Special Interrogatory but no for Advocate on Verdict Form A?" Following each question, the court instructed the jury in full or in part: "You have received the jury instructions. Please continue to deliberate."

¶ 36 The jury found Dr. Zhang liable and Advocate not liable and determined plaintiff's damages to be $3,350,000. With respect to the special interrogatories, the jury responded "Yes" to the first and "No" to the second.

¶ 37 Dr. Zhang and plaintiff both filed posttrial motions asserting that the special interrogatories were confusing and inconsistent with the general verdict. Dr. Zhang sought a new trial, and plaintiff sought judgment against Advocate or, alternatively, a new trial. The trial court denied the motions.

¶ 38                                    ANALYSIS

¶ 39                                        I.

¶ 40 Plaintiff first argues that the trial court's verdict in favor of Advocate on liability is inconsistent with the jury's answer to the first special interrogatory because the jury found that Dr. Zhang was the apparent agent of Advocate in 2009 and yet found Advocate not liable for plaintiff's injuries.

12

¶ 41    "A special interrogatory is a question posed to the jury for its consideration during deliberations that supplements its consideration of the case." *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 117. "A special interrogatory serves 'as guardian of the integrity of a general verdict in a civil trial.' " *Simmons v. Garces*, 198 Ill. 2d 541, 555 (2002) (quoting *O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 460 (1996)).

¶ 42    "A special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned." *Id.* "If a special interrogatory does not cover all the issues submitted to the jury and a 'reasonable hypothesis' exists that allows the special finding to be construed consistently with the general verdict, they are not 'absolutely irreconcilable' and the special finding will not control." *Id.* "In determining whether answers to special interrogatories are inconsistent with a general verdict, all reasonable presumptions are exercised in favor of the general verdict." *Id*. A reviewing court determines, as a matter of law, if the jury's answer to a special interrogatory is inconsistent with a general verdict. *McCutchen v. Bigler*, 101 Ill. App. 3d 696, 697 (1981).

¶ 43    When the general verdict and the answer to the special interrogatory are not "clearly and absolutely irreconcilable," the trial court should enter judgment in accordance with the general verdict. See *Stanphill v. Ortberg*, 2017 IL App (2d) 161086, ¶ 29 (citing *Simmons*, 198 Ill. 2d at 556). Additionally, when a special interrogatory is not in proper form, it will not control. See *id*. ¶ 33. Courts are reluctant to set aside a general verdict "unless the special findings exclude every reasonable hypothesis consistent with the general verdict." *Patur v. Aetna Life & Casualty*, 90 Ill. App. 3d 464, 468 (1980).

13

¶ 44    In this case, plaintiff alleged that Advocate was liable for her injuries based on the doctrine of apparent agency or apparent authority. Under this doctrine, a hospital can be held vicariously liable for the negligent acts of a physician providing care at the hospital even if the physician is an independent contractor unless the patient knows or should have known that the physician is an independent contractor. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 524 (1993). For a hospital to be liable under the doctrine, the plaintiff must show (1) the hospital held the physician out as having authority or knowingly acquiesced in the physician's exercise of authority; (2) based on the acts of the principal and agent, the third person reasonably concluded that an agency relationship existed; and (3) the third person relied on the physician's apparent authority to his detriment. See *id.* Whether a physician is an apparent agent of a hospital is a question of fact. See *id*. at 524.

¶ 45    Here, the jury's answer to the first special interrogatory is not "clearly and absolutely irreconcilable" with its general verdict in favor of Advocate. The jury could have found that Dr. Zhang was an apparent agent of Advocate in 2009, but was not guilty of negligence and/or did not cause an injury to plaintiff until 2010 or thereafter, when she was no longer an apparent agent of Advocate. That conclusion is supported by the testimony of defendants' experts, Dr. Nicholas and Dr. Engelhard, who opined that Dr. Zhang did not breach the standard of care until she failed to obtain serial imaging of plaintiff in 2010 and thereafter, as well as plaintiff's own expert, Dr. Aghi, who testified "there was no harm done" to plaintiff by Dr. Zhang in 2009, when the jury found Dr. Zhang was the apparent agent of Advocate. Because the jury's answer to the special interrogatory and its general verdict were not "clearly and absolutely irreconcilable," the jury's verdict must stand. See *Stanphill*, 2017 IL App (2d) 161086, ¶ 29.

14

¶ 46        Plaintiff argues, however, that the general verdict rule requires us to find that the general verdict in favor of plaintiff and the jury's answer to the special interrogatory were irreconcilable. The Illinois legislature codified the general verdict rule as follows:

> "If several grounds of recovery are pleaded in support of the same claim, in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial." 735 ILCS 5/2-1201(d) (West 2020).

By enacting this rule, "the legislature clearly prioritized the upholding of jury verdicts, wherever possible ***." *Wright-Young v. Chicago State University*, 2019 IL App (1st) 181073, ¶ 108. "This is a priority long shared by courts." *Id.* The general verdict rule is designed to operate as a shield, not a sword. See *Dowling v. Finley Associates, Inc.*, 727 A.2d 1245, 1252 n.8 (Conn. 1999).

¶ 47        We reject plaintiff's contention that we should employ the general verdict rule against Advocate in this case by presuming that the jury found against Dr. Zhang on all counts of plaintiff's complaint. Such a presumption runs contrary to the purpose of the rule, which is to uphold jury verdicts whenever possible. See *Wright-Young*, 2019 IL App (1st) 181073, ¶ 108. Furthermore, while the jury entered a general verdict in favor of plaintiff and against Dr. Zhang, the jury also entered a general verdict in favor of Advocate. Interpreting the general verdict as plaintiff suggests

15

would nullify the jury's verdict in favor of Advocate. Because the purpose of the rule is to uphold jury verdicts, we decline to read the general verdict rule as plaintiff suggests.

¶ 48 Moreover, plaintiff forfeited her claim that the jury's answer to the special interrogatory and general verdict in favor of Advocate were inconsistent by failing to object before the jury was discharged. The Code of Civil Procedure (Code) states: "When any special finding of fact is inconsistent with the general verdict, the court shall direct the jury to further consider its answers and verdict." 735 ILCS 5/2-1108 (West 2020). If a party believes a special interrogatory and general verdict are inconsistent, the party must object as soon as the jury returns its verdict and answer. See *Strauss v. Stratojac Corp.*, 810 F.2d 679, 682-83 (7th Cir. 1987) (analyzing section of Federal Code of Civil Procedure nearly identical to section 2-1108 of the Code). A party's failure to object while the jury is still present in the courtroom results in the party's forfeiture of an objection to an alleged inconsistency between the special interrogatory and the general verdict. See *id*. at 683; *Team Contractors, L.L.C. v. Waypoint Nola, L.L.C.*, 976 F.3d 509, 515 (5th Cir. 2020); *DiBella v. Hopkins,* 403 F.3d 102, 117 (2d Cir. 2005); *Howard v. Antilla*, 294 F.3d 244, 250 (1st Cir. 2002). Because plaintiff failed to assert that the jury's answer to the special interrogatory and verdict were inconsistent while the jury was still empaneled, she forfeited that argument.

¶ 49 II.

¶ 50 Plaintiff also contends that the jury's verdict in favor of Advocate cannot stand because it was against the manifest weight of the evidence.

¶ 51 A reviewing court will reverse a jury verdict only if it is against the manifest weight of the evidence. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are

16

unreasonable, arbitrary, and not based upon any of the evidence. *Id.* It is well established that the reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury. *Id.* Furthermore, the weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999).

¶ 52      In a medical malpractice case where there has been opposing testimony among experts, it is inappropriate for a reviewing court to overturn the jury's verdict if it is supported by any evidence presented at the trial. See *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967, ¶¶ 30-31 (citing *Snelson*, 204 Ill. 2d at 36). A reviewing court may not "usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried and determined from the evidence." *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992).

¶ 53      For a hospital to be found liable for the negligent acts of a physician under the doctrine of vicarious liability, the plaintiff must prove what is known as the "holding out" factor – that (1) the hospital held out the physician as its agent, or (2) the hospital had knowledge of and acquiesced to the physician holding herself out as the hospital's agent. See *Wallace v. Alexian Brothers Medical Center,* 389 Ill. App. 3d 1081, 1087 (2009). The focus of this factor is whether "the patient knows, or should have known, that the physician is an independent contractor." *Gilbert,* 156 Ill. 2d at 524. "Although not dispositive of the 'holding out' factor, whether a patient signs a hospital consent to treatment form that contains clear and unambiguous independent contractor disclaimer language is an important factor to consider with respect to this factor because it is unlikely that a patient who signs such a form can reasonably believe that her treating physician is an employee or agent of a hospital when the form contains specific language to the contrary." *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 27; see *Mizyed v. Palos Community*

17

*Hospital,* 2016 IL App (1st) 142790, ¶¶ 59, 64; *Wallace,* 389 Ill. App. 3d at 1083, 1088; *James v. Ingalls Memorial Hospital,* 299 Ill. App. 3d 627, 632 (1998).

¶ 54    However, a consent form is ambiguous and raises a question of fact for the jury if it states that "some or all of the physicians who provide medical services" at the hospital "are not employees or agents of the hospital" and provides a list of specialties of "non-employed physicians" that does not include the specialty of the defendant physician. See *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶ 24. Additionally, even if a patient signs a consent form stating that physicians are independent contractors but presents other evidence that the hospital was "holding out" a physician as its agent or employee, the question becomes one for the jury. See *Mizyed*, 2016 IL App (1st) 142790, ¶ 63.

¶ 55    Evidence of "holding out" includes (1) the physician wearing scrubs or a lab coat with the hospital's logo (see *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 196 (2006)), (2) signage at the physician's office containing the logo and colors of the hospital, (3) the physician's office being located inside the hospital, or (4) the physician's webpage advertising services of the hospital (*Williams v. Tissier*, 2019 IL App (5th) 180046, ¶ 46). Factors weighing against a finding of "holding out" include that the patient was seen at the physician's office outside of the hospital and that the patient made appointments with the physician by calling the physician's office, not the hospital. See *Delegatto v. Advocate Health and Hospitals*, 2021 IL App (1st) 200484, ¶ 51.

¶ 56    In this case, a 10-day jury trial was held. At trial, each party presented expert testimony, witnesses and evidence to support their positions. The jury heard the expert testimony from plaintiff and defendants and ultimately decided in favor of Advocate. To disturb the jury's verdict in favor of Advocate, we must conclude that there was no evidence at trial to support its finding.

See *Eid*, 2017 IL App (1st) 143967, ¶¶ 30-31; *Snelson*, 204 Ill. 2d at 36. That is not the case here. There was evidence presented at trial to support the jury's special finding that Dr. Zhang was Advocate's apparent agent in 2009 based on (1) the ambiguous consent form that did not list Dr. Zhang's specialty (neurology) (see *Hammer*, 2016 IL App (1st) 143066, ¶ 24), (2) Dr. Zhang wearing a coat and badge with Advocate's logo (see *York*, 222 Ill. 2d at 196), and (3) plaintiff seeking treatment from Advocate, not specifically Dr. Zhang, on August 25, 2009 (see *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826, 841 (2009)). There was also evidence to support the jury's finding that Dr. Zhang's apparent agency ended in 2009 because plaintiff obtained treatment from Dr. Zhang in her private neurology practice in an office located outside the hospital from 2010 to 2014. See *Delegatto*, 2021 IL App (1st) 200484, ¶ 51.

¶ 57        Additionally, there was evidence supporting the jury's determination that Advocate was not liable to plaintiff because Dr. Zhang's medical negligence did not take place until 2010 or thereafter, when it was no longer reasonable for plaintiff to believe that Dr. Zhang was acting on behalf of Advocate. While plaintiff's experts presented testimony that Dr. Zhang deviated from the standard of care from 2009 to 2014, there was ample evidence to support the conclusions that (1) Dr. Zhang did not violate the standard of care until 2010 or thereafter; and/or (2) Dr. Zhang's actions/inactions did not cause injury to plaintiff until 2010 or thereafter. Defendants' expert, Dr. Nicholas, testified that Dr. Zhang only violated the standard of care by failing to obtain additional MRIs of plaintiff after 2009. Additionally, plaintiff's own expert, Dr. Aghi, testified that Dr. Zhang did no harm to plaintiff until after 2009 because plaintiff's tumor stayed essentially the same in 2009. Because there was evidence to support the jury's finding that Advocate was not vicariously liable for Dr. Zhang's negligence, the jury's verdict is not against the manifest weight of the evidence. See *Eid*, 2017 IL App (1st) 143967, ¶ 31.

CONCLUSION

¶ 58      The judgment of the circuit court of Du Page County is affirmed.

¶ 59      Affirmed.